1   GLYNN & FINLEY, LLP
    CLEMENT L. GLYNN, State Bar No. 57117
2   JONATHAN A. ELDREDGE, State Bar No. 238559
    One Walnut Creek Center
3   100 Pringle Avenue, Suite, 500
    Walnut Creek, CA 94596
4   Telephone:  (925) 210-2800
    Facsimile:  (925) 945-1975
5   E-mail: cglynn@glynnfinley.com
        jeldredge@glynnfinley.com
6
    KLARQUIST SPARKMAN, LLP
7   JEFFREY S. LOVE, State Bar No. 195068
    121 S.W. Salmon Street, Suite 1600
8   Portland, Oregon  97204-2988
    Telephone:  (503) 595-5300
9   Facsimile:  (503) 595-5301
    E-mail: jeffrey.love@klarquist.com
10
    Attorneys for Plaintiffs
11  GENERAL ELECTRIC COMPANY AND
    GE WIND ENERGY, LLC
12

13                 UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  GENERAL ELECTRIC COMPANY, a New  )  **Case No. CV 10-00674-OWW-JLT**
    York corporation; and GE WIND ENERGY, )
17  LLC, a Delaware limited liability company,  )  **MEMORANDUM OF POINTS AND**
                                 )  **AUTHORITIES OF PLAINTIFFS**
18            Plaintiffs,  )  **GENERAL ELECTRIC COMPANY**
                                 )  **AND GE WIND ENERGY, LLC IN**
19      vs.  )  **SUPPORT OF THEIR MOTION FOR A**
                                 )  **PRELIMINARY INJUNCTION**
20  THOMAS WILKINS, an individual,  )  **AGAINST DEFENDANT THOMAS**
                                 )  **WILKINS**
21          Defendant.  )
                               )  **Date:     September 27, 2010**
22  _____ )  **Time:    10:00 a.m.**
                                        **Court:   Courtroom 3**
23                                            **Before:  Hon. Oliver W. Wanger**

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................1

II.    FACTUAL BACKGROUND ...........................................................................3

       A.     Wilkins' Employment at Enron Wind .................................................3

       B.     Enron Wind's C&I Agreement ............................................................3

       C.     GE Acquires Enron Wind's Assets......................................................4

       D.     GE's EIPI Agreement .........................................................................5

       E.     GE's Patents.......................................................................................5

              1.   The '565 Patent .........................................................................6

              2.   The '985 Patent .........................................................................6

       F.     Wilkins Purports to License GE's Technology to GE's Competitor, MHI,
              Offers to License the Same Technology to Anyone Willing to Pay and
              Demands that GE Pay to Use Technology GE Owns .............................8

III.   ARGUMENT ................................................................................................8

       A.     GE Is Likely To Succeed on the Merits................................................9

              1.   Wilkins Breached the EIPI Agreement.............................................9

              2.   Wilkins Breached the C&I Agreement ...........................................12

              3.   California Statutory and Common Law – Work For Hire Doctrine ...............13

       B.     GE Will Suffer Irreparable Harm in the Absence of Preliminary
              Injunctive Relief ..............................................................................16

       C.     The Balance of Equities Tip in GE's Favor........................................18

       D.     Injunctive Relief is in the Public's Interest.........................................19

IV.    CONCLUSION............................................................................................20

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Abbott v. Los Angeles*
    53 Cal.2d 674 (1960) ................................................................................... 13

4

*Aero Bolt & Screw Comp. of Cal., Inc. v. Iaia*
    180 Cal.App.2d. 728 (1960) ......................................................................... 14

5

6

*Apple Inc. v. Psystar Corp.*
    673 F.Supp.2d 943 (N.D. Cal. 2009) ..................................................... 18, 19

7

*Asmus v. Pacific Bell*
    23 Cal.4th 1 (2000) .............................................................................. 10, 12

8

*Boyajian v. New Falls Corp.*
    564 F.3d 1088 (9th Cir. 2009) ..................................................................... 12

9

10

*Byrum v. Landreth*
    566 F.3d 442 (5th Cir. 2009) .......................................................................... 9

11

12

*Campbell Soup Comp. v. Conagra, Inc.*
    977 F.2d 86 (3rd Cir. 1992) ........................................................................... 16

13

*Cappa v. Crosstest, Inc.*
    2008 WL 821637 (Cal. App. 2008) .............................................................. 14

14

15

*Concrete Washout Systems, Inc. v. Washout Systems, LLC*
    2008 WL 5411965 (E.D. Cal. 2008) ....................................................... 16, 17

16

*Craig v. Brown & Root, Inc.*
    84 Cal.App.4th 416 (2000) ..................................................................... 10, 12

17

18

*Daniel Orifice Fitting Comp. v. Whalen*
    198 Cal.App.2d 791 (1962) ..................................................................... 14, 15

19

*Deckert v. Independence Shares Corp.*
    311 U.S. 282 (1940) ..................................................................................... 17

20

21

*Famous Players-Lasky Corp. v. Ewing*
    49 Cal.App. 676 (1920) ................................................................................ 14

22

*Hercules Glue Co. v. Littooy*
    25 Cal.App.2d 182 (1938) ............................................................................ 16

23

24

*Kowalski v. Mommy Gina Tuna Resources*
    Slip Copy 2009 WL 856006 (D.Hawai'i 2009) ............................................ 18

25

*LG Electronics, Inc. v. Eastman Kodak, Co.*
    Slip Copy 2009 WL 1468703 (S.D. Cal. 2009) .............................................. 7

26

27

28

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES
### Continued

*Lopes v. Vieira*
    688 F.Supp.2d 1050 (E.D. Cal. 2010)...................................................... 16

*Manson, Iver & York v. Black*
    176 Cal.App.4th 36 (2009) ............................................................... 12

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck*
    *Consumer Pharmaceuticals Co.*
    290 F.3d 578 (3rd Cir. 2002). .......................................................... 18

*Oakley, Inc. v. Sunglass Hut Int'l*
    2001 WL 1683252 (C.D. Cal. 2001)............................................... 17, 19

*Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*
    284 F.3d 1323 (Fed. Circ. 2002)....................................................... 19

*Ringfree USA Corp. v. Ringfree Comp., Ltd.*
    2008 WL 4691046 (C.D. Cal. 2008)................................................... 16

*Savoie v. Merchants Bank*
    84 F.3d 52 (2nd Cir. 1996)........................................................... 16, 18

*Sierra Forest Legacy v. Rey*
    577 F.3d 1015 (9th Cir. 2009) ........................................................... 8

*Simula, Inc. v. Autoliv, Inc.*
    175 F.3d 716 (9th Cir. 1999) ........................................................... 16

*Solomons v. United States*
    137 U.S. 342 (1890)...................................................................... 14

*Spinks v. Equity Residential Briarwood Apartments*
    171 Cal.App.4th 1004 (2009) ............................................................ 9

*Stuhlbarg Int'l Sales Comp., Inc. v. John D. Brush and Comp., Inc.*
    240 F.3d 832 (9th Cir. 2001) .................................................. 16, 17, 18

*Univ. of Texas v. Camenisch*
    451 U.S. 390 (1981)....................................................................... 9

*Winter v. Natural Resources Defense Council, Inc.'*
    129 S.Ct. 365 (2008)...................................................................... 8

*Yang v. Home Loan Funding, Inc.*
    Slip Copy 2010 WL 670958 (E.D. Cal. 2010)..................................... 12

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**

1

<u>**TABLE OF AUTHORITIES**</u>
**Continued**

2

3    <u>STATUTES</u>

4    17 United States Code (U.S.C.) section 101 ................................................................... 5

5    35 United States Code (U.S.C.) section 154 ................................................................. 16

6    Cal. Code of Civ. Proc. section 1060 ...................................................................... 9, 13

7    Cal. Labor Code section 2860 ............................................................................. 13, 14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1  **I.**     **<u>INTRODUCTION</u>**

2       General Electric Company and its subsidiary GE Wind Energy, LLC (collectively "GE")

3  bring this motion seeking an order preserving the status quo pending a trial on the merits.  By

4  this action, GE seeks a determination that Defendant Thomas Wilkins ("Wilkins") has no

5  legitimate right to claim any interest in certain GE patented technology.  Although well aware of

6  GE's position, Wilkins—a former employee of GE who was hired to invent—has offered via the

7  internet to license GE's technology to others after being put on notice that Wilkins' right to

8  license is disputed.  GE will be irreparably harmed if Wilkins is not enjoined from licensing

9  GE's patented technology during the pendency of this action.

10       GE is a leader in the development of renewable energy.  In an effort to make renewable

11  and clean energy more widely available, GE has devoted significant resources to developing

12  technology to capture wind energy to generate electricity.  In 2002, GE purchased the assets,

13  including intellectual property, of Enron Wind Corporation ("Enron Wind").  At the time GE

14  purchased Enron Wind, Wilkins was a Power Systems Engineer for Enron Wind whose

15  employment required that he work on various design projects related to wind turbine generator

16  systems.  Wilkins worked for GE for approximately six months after GE's acquisition of Enron

17  Wind and then voluntarily resigned.  During the course of his employment at Enron Wind (and

18  later GE), Wilkins (along with other Enron Wind and GE employees) allegedly worked on

19  various projects that resulted in two patents related to wind turbine generators referred to as the

20  '565 and '985 Patents.[1]

21       Pursuant to agreements between Wilkins and GE (individually and as a successor to

22  Enron Wind) and California statutory and common law, Wilkins was required to assign all rights

23  he had in the patents to GE.  All inventors of the '565 and '985 Patents except Wilkins assigned

24  their rights in the patents to GE.  Nevertheless, Wilkins made no assertion of ownership in the

25

26  _____

27  [1]    As discussed below, Wilkins was a co-inventor of the '565 Patent; GE disputes that Wilkins was a co-inventor of the '985 Patent, but Wilkins claims otherwise.  That dispute need not be resolved here because even were Wilkins a co-inventor of the '985 Patent, he was required to

28  assign any rights in the invention to GE.

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1   patents during his employment with GE or Enron Wind, and GE filed its patent applications and
2   received patents for the technology.
3         In 2009, GE filed a patent infringement action against Mitsubishi Heavy Industries, Ltd.
4   and related entities (collectively "MHI") for infringing certain GE patents related to wind turbine
5   generators.  Previously, in 2008, GE had filed an action with the International Trade
6   Commission ("ITC") against MHI related to its patent infringement.  During proceedings before
7   the ITC, Wilkins (who was hired by MHI as a consultant for the litigation) claimed for the first
8   time that he was a co-inventor of the '985 Patent; Wilkins later claimed that he was also the
9   owner of the '565 Patent.  Wilkins recently disclosed that during the pendency of the patent
10  infringement case and without GE's knowledge or consent, he purported to grant a license to
11  GE's patents to MHI.  Recently, after GE filed this case, Wilkins began offering to sell licenses
12  to other interested third parties on his website in violation of his obligation to assign any such
13  rights to GE.
14        The '565 and '985 Patents were developed during Wilkins' employment with Enron
15  Wind or GE, and any contributions by Wilkins would have been part of his job duties as a Power
16  Systems Engineer.  Thus, Wilkins was contractually and legally obligated to assign his purported
17  rights in the technology to GE.  Nevertheless, despite his contractual and legal obligations,
18  Wilkins refuses to assign to GE his alleged ownership rights, and he continues to offer licenses
19  to GE's patents on his website despite GE's demand that he stop.  Indeed, recently Wilkins
20  actually demanded that GE pay him to license the rights to GE's patent.
21        GE has been harmed by Wilkins' assertions of ownership in GE's patents, including the
22  surreptitious license to MHI, and will be irreparably harmed by Wilkins' continued attempts to
23  grant further licenses of GE's proprietary technology.  It is therefore crucial that the Court issue
24  a preliminary injunction prohibiting Wilkins from licensing to third parties GE's technology and
25  intellectual property rights, thereby maintaining the status quo during the pendency of this case.
26  / / /
27  / / /
28  / / /

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

## II.   FACTUAL BACKGROUND

### A.   Wilkins' Employment at Enron Wind

On December 17, 2001, Enron Wind offered to re-hire Wilkins as a "Power Systems Engineer" at its offices in Tehachapi, California.[2]  (*See* Declaration of Norland L. Brace ("Brace Decl."), Exh. A.)  Wilkins' job responsibilities included "the design, development, installation and testing of the Enron Wind Dynamic VAR system" and "interact[ing] with the Advanced Technology Group as needed to provide input for new technology developments including control system, converter system, pitch system, generator system and overall wind turbine design."  (*Id.*, Exh. A at p. 1.)  As a term of his employment, Wilkins was "required to sign a Confidentiality and Inventions Agreement."  (*Id.*, Exh. A at p. 2.)  Wilkins' employment was to start on January 2, 2002.  (*Id.*)

On February 3, 2002, Wilkins signed Enron Wind's offer of employment.  (Brace Decl., Exh. A at p. 5.)  On the same date, Wilkins executed the Enron Wind Confidentiality and Inventions Agreement (the "C&I Agreement").[3]  (*Id.* at ¶ 4.)

### B.   Enron Wind's C&I Agreement

Pursuant to Enron Wind's C&I Agreement:

- Wilkins specifically acknowledged that he understood "that during [his] employment with [Enron Wind] and for one year thereafter, [his] development of ideas, processes, inventions, technology, designs and similar things ("Invention Ideas") is subject to the terms of [the C&I] agreement."  (Brace Decl., Exh. B at p. 1.)

- Wilkins agreed that "all Invention Ideas created or developed by [him], alone or with others, during the course of [his] employment with [Enron Wind], are works for hire and therefore the property of [Enron Wind]."  (Brace Decl., Exh. B at p. 2.)

---

[2]   Wilkins previously worked for Enron Wind in various positions as an engineer.

[3]   Although GE has been unable to locate a copy of the signed C&I Agreement, Mr. Brace – Enron Wind's Human Resources Manager in 2002 – specifically recalled confronting Wilkins and requiring him to sign the C&I Agreement, which was a condition of his employment as explained in the employment offer.  (Brace Decl., ¶ 4.)  Wilkins relented and signed the agreement.  (*Id.*)  Had he failed to do so, he would have been fired.

1    • Wilkins further agreed "upon [Enron Wind's] request and without the need for further

2      consideration, to execute any and all documents and take such actions which may be

3      necessary in [Enron Wind's] judgment to assign all rights to any Invention Idea to [Enron

4      Wind]."  (Brace Decl., Exh. B at p. 2.)

5    • Wilkins also acknowledged that "Invention Ideas which are reduced to practice within

6      one year after [his] employment with [Enron Wind] will be presumed to be Invention

7      Ideas subject to this agreement, unless [he] can show that such Invention Idea was not

8      conceived or developed during the term of [his] employment."  (Brace Decl., Exh. B at p.

9      2.)

10   **C.      GE Acquires Enron Wind's Assets**

11   On May 10, 2002, GE acquired Enron Wind's assets, including its intellectual property.

12   (Declaration of James E. McGinness ("McGinness Decl."), at ¶ 2.)  After the acquisition, GE

13   retained some of Enron Wind's employees, including Wilkins, who were integrated into GE.[4]

14   (Declaration of David Hunt ("Hunt Decl."), at ¶ 2.)  As part of the integration, all Enron Wind

15   employees were required to sign various employment forms relating to their employment with

16   GE, including company policies and agreements regarding GE's intellectual property.  (*Id.*)

17   Because these forms were a condition of employment, if any of Enron Wind's employees refused

18   to sign the agreements, they would have been immediately terminated by GE.  (*Id.*)

19   GE's Employee Innovation and Proprietary Information Agreement ("EIPI Agreement")

20   is the governing agreement for GE employees relating to intellectual property developed during

21   employment with GE.  (Hunt Decl., at ¶ 3 and Exh. A.)  All GE employees, including those who

22   ///

23   ///

24   ///

25   ///

26

27   [4]   Wilkins continued to work for GE pursuant to his employment agreement with Enron Wind
     until December 1, 2002 when he voluntarily resigned.  (Brace Decl., ¶ 5.)

28

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

came from acquired companies, are required to sign the EIPI Agreement, and Wilkins was

required to sign as a condition of his employment with GE.[5]  (*Id.* at ¶¶ 2-3.)

**D.   GE's EIPI Agreement**

Pursuant to GE's EIPI Agreement, Wilkins was required to:

> disclose and assign to [GE] (or as [GE] may direct) as its exclusive property, all
> inventions, discoveries, innovations, improvements, trade secrets and technical or
> business information which [Wilkins] may solely or jointly develop, conceive,
> reduce to practice or author during the period of [his] employment (1) that relates
> to the business or the present or demonstrated or reasonably foreseeable future
> research or development of [GE] or its parent, subsidiaries or affiliates, or (2) that
> result from or are suggested by any work that [Wilkins] may do for [GE] or its
> parent, subsidiaries, or affiliates or (3) that are otherwise made through the use of
> [GE], or its parent, subsidiaries or affiliates, time, equipment, supplies, facilities,
> material or secret* or confidential* information or data.

(Hunt Decl., Exh. A at p. 1.)  Wilkins also agreed that "all original works of authorship that are

made by [him] (solely or jointly with others) within the scope of [his] employment and that are

protectable by copyright are 'works made for hire,' as that term is defined in the United States

Copyright Act (17 U.S.C. Sec.101) and [Wilkins] further agree[s], to the extent any such work is

determined not to be a 'work made for hire,' that [Wilkins] will disclose and assign to [GE] (or

as [GE] may direct) as its exclusive property any such original work of authorship[.]"  (*Id.*)  The

EIPI Agreement "supersede[d] and replace[d] any existing agreement between [GE] and

[Wilkins] relating generally to the same subject matter."  (*Id.*)

**E.   GE's Patents**

Two patents are involved in this litigation.  Patent No. 6,924,565 ("'565 Patent") for

"Continuous reactive power support for wind turbine generators," and Patent No. 6,921,985

("'985 Patent") for "Low voltage ride through for wind turbine generators."

---

[5]   GE has been unable to locate a signed copy of Wilkins' EIPI Agreement.  (Hunt Decl., ¶ 3.)
Nevertheless, signing the agreement was a condition of his employment and he would have been
terminated if he did not sign the agreement.  (*Id.* at ¶¶ 2-3.)  Further, GE has located a signed
copy of Wilkins' acknowledgement that he understood GE's employment policies.  (*Id.* at ¶ 4
and Exh. B.)  GE presented all of the employment forms for signature, including GE's policies
and the EIPI Agreement, to the employees at the same time.  (*Id.* at ¶ 4.)  Thus, Wilkins was
required to sign the EIPI Agreement at the same time he signed the acknowledgment or face
termination.

**1.     The '565 Patent**

The '565 Patent applies to "[r]eal and reactive power control for wind turbine generator systems.  The technique described herein provides the potential to utilize the total capacity of a wind turbine generator system (e.g., a wind farm) to provide dynamic VAR (reactive power support).  The VAR support provided by individual wind turbine generators in a system can be dynamically varied to suit application parameters."  (McGinness Decl., Exh. A at p. 1.)

Wilkins, as well as other GE employees, are identified as the inventors of the '565 Patent. (McGinness Decl., Exh. A at p. 1.)  The '565 Patent identifies GE as the assignee, and all of the inventors except Wilkins have assigned their rights to the '565 Patent to GE.  (*Id.*, Exh. A at p. 1 and ¶ 3)  The patent application was filed on August 18, 2003, and the patent issued on August 2, 2005.  (*Id.*, Exh. A at p. 1.)  GE has licensed and offers licenses for use of the technology.  (*Id.* at ¶ 3.)

As part of GE's employee invention disclosure requirements, Wilkins signed and submitted a "Record of Invention" disclosing technology included in the '565 Patent. (McGinness Decl., Exh. B.)  The disclosure describes a "[c]ontinuous [wind turbine generator] VAR support coupled with Real and Reactive power prioritization for the [GE wind turbine generators]."  (*Id.*, Exh. B at p. 1.)  The Record of Invention identifies Wilkins and Nagwa Elkachouty, also a former GE employee working in Tehachapi, California, as inventors.  (*Id.*, Exh. B at p. 2.)  The invention was "first thought of by" Wilkins on May 31, 2002 (while he was working for GE); and first disclosed to Ralph Blakemore, a GE employee in charge of handling employee inventions, on the same date.  (*Id.*)  The "Invention Disclosure Summary" identifies "Thomas Wilkins, Power Systems Engineer" as the inventor, and "Tehachapi Engineering Center (GE Wind Energy – Americas) as the location.  (*Id.*, Exh. B at p. 4.)

**2.     The '985 Patent**

In general, the '985 Patent relates to maintaining wind turbine operation during low voltage grid disturbances, which previously resulted in wind turbines shutting down.  (*See* McGinness Decl., Exh. C.)

/ / /

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1        Five GE employees from Salzbergen, Germany are identified as the inventors of the '985

2  Patent.  (McGinness Decl., Exh. C at p. 1.)  Wilkins is not identified as, and GE disputes that

3  Wilkins was, an inventor of the '985 Patent.  (*Id.*)  The '985 Patent identifies GE as the assignee,

4  and all of the identified inventors have assigned their rights to the '985 Patent to GE.  (*Id.*, Exh.

5  C at p. 1 and ¶ 5)  The patent application was filed on January 24, 2003, and the patent issued on

6  July 26, 2005.  (*Id.*, Exh. C at p. 1.)  GE has licensed and offers licenses for use of the

7  technology.  (*Id.* at ¶ 5.)

8        Wilkins claims inventorship of the '985 Patent based on opinions by the ITC.[6]  (*See*

9  Declaration of Clement L. Glynn ("Glynn Decl."), Exhs. A1 and C1 ("the [ITC] has ruled that I

10  am an inventor of the technology described within the ['985 Patent], and have an equitable

11  interest in this Invention.").)  On August 7, 2009, ITC Administrative Law Judge ("ALJ") Carl

12  C. Charneski issued his "Initial Determination" in a dispute between GE and MHI entitled *In the*

13  *Matter of Certain Variable Speed Wind Turbines and Components Thereof*, Inv. No. 337-TA-

14  641.  (McGinness Decl., Exh. D.)  In his opinion, Judge Charneski found that in 2002, Wilkins

15  was the lead power systems electrical engineer for GE in California and his job was to develop

16  and design low voltage ride-through systems; that while working for GE, Wilkins communicated

17  with GE's engineers in Germany (and visited Germany on one occasion) concerning the low

18  voltage ride-through systems; and that Wilkins' assistance contributed to the '985 Patent

19  developed by GE's German engineers.  (*Id.*, Exh. D at pp. 117-119.)[7]  On January 19, 2010, in

20  its "Commission Opinion," the ITC affirmed with little analysis the ALJ's decision that Wilkins

21  was a co-inventor of the '985 Patent.  (*Id.*, Exh. E at pp. 35-36.)

22

23  ───────────────

24  [6]   The ITC opinions are not binding on this Court, and GE has appealed the decision to the Federal Circuit Court of Appeal.  *See LG Electronics, Inc. v. Eastman Kodak, Co.,* Slip Copy

25  2009 WL 1468703 *4 (S.D. Cal. 2009) ("To the extent the ITC's findings might bear on issues relevant to this litigation, the Court notes that the ITC's decisions are not binding on the Court.

26  [Citation.]"); *see also* McGinness Decl., at ¶ 8.  Nevertheless, Wilkins' inventorship claim is based on the ITC opinions, and thus, we address them.

27  [7]   The underlying testimony, including deposition and hearing testimony, of Wilkins and other witnesses is subject to a protective order preventing disclosure of that testimony in the present

28  case.  GE is presently taking steps to lift the protective order.

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1  **F.    Wilkins Purports to License GE's Technology to GE's Competitor,**
2  **MHI, Offers to License the Same Technology to Anyone Willing to**
   **Pay and Demands that GE Pay to Use Technology GE Owns**

3  On September 3, 2009, GE filed a lawsuit against MHI for infringing the '985 Patent and

4  other unrelated patents in the United States District Court for the Southern District of Texas,

5  Case No. 2:09-cv-00229.  (McGinness Decl., at ¶ 9.)  After that lawsuit was filed and without

6  GE's knowledge or consent, Wilkins purported to grant a license to MHI to use GE's technology

7  pursuant to the '985 Patent.  (*See* Glynn Decl., at ¶ 3.)  On May 17, 2010, after the present

8  litigation was filed, Wilkins notified GE for the first time that he had granted the license, but

9  refused to disclose the terms.  (*Id.*)

10  GE also recently learned that on Wilkins' website, he claims he owns rights to the

11  technology which is the subject of the '565 and '985 Patents.  (Glynn Decl., Exhs. A and A1.)

12  He also offers to "license his inventive technology to interested parties."  (*Id.*, Exh. A1 at ¶ 4.)

13  On May 25, 2010, GE's counsel notified Wilkins through his counsel that he "is on

14  notice that any further attempt to license this technology is unauthorized and invalid."  (Glynn

15  Decl., at ¶ 4.)  Apparently in response to GE's counsel's notice, on June 2, 2010, Wilkins —

16  through his attorney—notified GE's counsel of his "non-abandonment" of his rights in, and

17  intent to license, the '565 and '985 Patents, and further notified GE's counsel that he had not

18  authorized GE to "market, sell, utilize, or implement [the] technology" covered by those patents.

19  (*Id.*, Exh. C1.)  Wilkins offered to grant a license to GE to use this technology.  (*Id.*)

20  **III.    ARGUMENT**

21  "The sole purpose of a preliminary injunction is to 'preserve the status quo ante litem

22  pending a determination of the action on the merits.'  [Citation.]"  *Sierra Forest Legacy v. Rey,*

23  577 F.3d 1015, 1023 (9th Cir. 2009).  "A plaintiff seeking a preliminary injunction must establish

24  that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

25  absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

26  is in the public interest.  [Citations.]"  *Winter v. Natural Resources Defense Council, Inc.,* 129

27  S.Ct. 365, 374 (2008).  The present case presents a paradigm situation for injunctive relief.

28  / / /

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**

1  **A.      GE is Likely To Succeed on the Merits**

2      "The purpose of the preliminary injunction is merely to preserve the relative positions of

3  the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste

4  that is often necessary if those positions are to be preserved, a preliminary injunction is

5  customarily granted on the basis of procedures that are less formal and evidence that is less

6  complete than in a trial on the merits.  A party thus is not required to prove his case in full at a

7  preliminary-injunction hearing [citation], and the findings of fact and conclusions of law made

8  by a court granting a preliminary injunction are not binding at trial on the merits [citations]."

9  *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *see also Byrum v. Landreth,* 566 F.3d

10  442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary

11  judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary

12  injunction purposes.  [Citation.]").

13      GE has pleaded claims for declaratory relief, breach of contract, specific performance

14  and injunctive relief.  (*See* Docket No. 1.)  Breach of contract requires "'a contract, plaintiff's

15  performance or excuse for failure to perform, defendant's breach and damage to plaintiff

16  resulting therefrom.'  [Citation.]"  *Spinks v. Equity Residential Briarwood Apartments,* 171

17  Cal.App.4th 1004, 1031 (2009).  In addition to Wilkins' contractual duties, he was also required

18  to assign rights to the patents to his employer pursuant to California statutory and common law,

19  as referenced in GE's declaratory relief claim.  To support such declaratory relief, GE must show

20  that there is an actual, present controversy over a proper subject and that GE is entitled to the

21  requested declaration.  *See* Cal. Code of Civ. Proc., § 1060.

22      The gravamen of GE's complaint is that GE owns the technology in question yet Wilkins

23  asserts ownership rights.  GE has already been harmed by Wilkins' actions, and unless Wilkins

24  is enjoined from taking such further actions, GE will suffer further irreparable harm.

25      **1.      Wilkins Breached the EIPI Agreement**

26      GE has not been able to find Wilkins' signed copy of the EIPI Agreement, but it can

27  prove he agreed to its terms.  When GE purchased Enron Wind's assets and retained Enron

28  Wind's employees, it required all of them, including Wilkins, to execute the EIPI Agreement.

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1   (Hunt Decl., at ¶¶ 2-3.)  Had Wilkins refused to sign the EIPI Agreement, he would have been

2   fired.  (*Id.*)  His employment with GE after the Enron Wind acquisition evidences his agreement

3   to the terms of the EIPI Agreement.  *See, e.g., Asmus v. Pacific Bell,* 23 Cal.4th 1, 15 (2000)

4   ("Continuing to work after the policy termination and subsequent modification constituted

5   acceptance of the new employment terms.  [Citation.]"); *Craig v. Brown & Root, Inc.,* 84

6   Cal.App.4th 416, 420 (2000) ("General principles of contract law determine whether the parties

7   have entered a binding agreement to arbitrate. [Citation.] This means that a party's acceptance of

8   an agreement to arbitrate may be express [citations] or implied-in-fact where, as here, the

9   employee's continued employment constitutes her acceptance of an agreement proposed by her

10  employer [citation]."). Thus, there was a valid agreement between GE and Wilkins.[8]

11      The EIPI Agreement was made in consideration of Wilkins' employment by GE.  (Hunt

12  Decl., Exh. A at p. 1.)  Wilkins worked at GE after GE purchased Enron Wind's assets, and

13  received compensation, until he voluntarily resigned on December 1, 2002.  (Brace Decl., at ¶ 5.)

14  Thus, GE fully performed pursuant to the EIPI Agreement.

15      The EIPI Agreement required that Wilkins assign to GE "all inventions, discoveries,

16  innovations, improvements, trade secrets and technical or business information which [Wilkins]

17  may solely or joint develop, conceive, reduce to practice or author during the period of [his]

18  employment . . . ."  (Hunt Decl., Exh. A at p. 1.)  Patent '565 relates to a VAR system and was

19  developed by Wilkins, as well as other GE employees, while Wilkins worked for GE as a Power

20  Systems Engineer.  (McGinness Decl., Exhs. A and B.)  Wilkins disclosed the invention to GE

21  on May 31, 2002 for the purpose of seeking a patent, which eventually led to the '565 Patent.

22  (*Id.*, Exh. B and ¶ 4.)  Because the invention was developed as part of Wilkins' employment, he

23  was required to assign to GE all his rights in the invention.  (*See* Hunt Decl., Exh. A at p. 1.)

24  Wilkins has nevertheless asserted he owns the rights to the invention which is the subject of the

25  _____

[8]   Pursuant to the EIPI Agreement, Wilkins was required to disclose inventions to GE and

26  maintain written records of such inventions.  (Hunt Decl., Exh. A at ¶¶ (a) and (d).)  For the '565
Patent technology Wilkins worked on with other GE employees, he made such a disclosure.  (*See*

27  McGinness Decl., Exh. B.)  Wilkins' compliance with the terms of the EIPI Agreement after he
started working for GE demonstrates his agreement to abide by its terms.

28

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1   '565 Patent, is offering to sell licenses to the technology and is demanding that GE itself obtain a

2   license from him to use the patented technology.  (Glynn Decl., Exhs. A, A1 and C1.)  Wilkins

3   has breached the EIPI Agreement in relation to the '565 Patent.

4       GE disputes that Wilkins is an inventor of, or holds any rights to, the '985 Patent, but its

5   claims in this action do not require resolution of that issue.  If Wilkins was in fact a co-inventor

6   of the technology covered by the '985 Patent, his work took place in the course of his

7   employment with GE, which is what the ITC concluded.  (*See* McGinness Decl., Exh. D at p.

8   118 ["At that time, Wilkins was the lead power systems electrical engineer in California, and his

9   job was to develop new designs for low voltage ride-through."].)  Thus, even were it true that

10  Wilkins contributed to the '985 Patent, he did so as part of his employment with GE, and thus,

11  pursuant to the EIPI Agreement, he was required to assign any rights he had to GE.  (Hunt Decl.,

12  Exh. A.)  Wilkins has asserted he owns the rights to the invention which is the subject of the

13  '985 Patent, has licensed the '985 Patent to GE's competitor MHI, is offering to sell licenses to

14  the technology and is demanding that GE itself license the rights to the '985 Patent from him.

15  (Glynn Decl., Exhs. A, A1 and C1, and ¶ 3.)  Thus, Wilkins has breached the EIPI Agreement in

16  relation to the '985 Patent.

17      GE has been damaged as a result of Wilkins' actions.  First, he has purported to license

18  GE's technology to one of GE's most aggressive competitors, MHI.  (Glynn Decl., at ¶ 3.)

19  Further, GE has been forced to institute the present action against Wilkins because Wilkins

20  claims ownership of the '565 and '985 Patents and refuses to assign those rights to GE despite

21  his obligations to do so.  (*See* Hunt Decl., Exh. A.)  Finally, GE has just learned that Wilkins is

22  currently attempting to license both patents to third parties and is demanding that GE itself pay

23  him for the right to use technology GE owns.  (Glynn Decl., Exhs. A, A1 and C1.)

24      The evidence is clear that Wilkins has breached his obligations to GE under the EIPI

25  Agreement and that such breach has damaged GE.  Thus, GE is likely to succeed on the merits of

26  its breach of contract claim pursuant to the EIPI Agreement.

27  ///

28  ///

## 2.     Wilkins Breached the C&I Agreement

The EIPI Agreement superseded all prior agreements between GE and Wilkins "relating generally to the same subject matter" (i.e., ownership and assignment of inventions).  (Hunt Decl., Exh. A at p. 1.)  Thus, the EIPI Agreement would have superseded the C&I Agreement.  If for any reason the EIPI Agreement were not controlling, the C&I Agreement would govern and the result would be the same.  As part of its acquisition of Enron Wind, GE obtained all of Enron Wind's intellectual property and stepped into the shoes of Enron Wind for purposes of the C&I Agreement between Enron Wind and Wilkins.[9]  (McGinness Decl., at ¶ 2.)

When Enron Wind offered Wilkins employment on December 17, 2001, it explicitly stated that his employment was conditioned on execution of the C&I Agreement.  (Brace Decl., Exh. A at p. 2.)  Wilkins signed the employment offer and C&I Agreement on February 3, 2002.  (*Id.*, Exh. A at p. 5 and ¶ 4.)  Further, Wilkins' employment with Enron Wind (and GE thereafter) itself constituted an acceptance of the terms of the employment offer, including the C&I Agreement.  *See, e.g., Asmus,* 23 Cal.4[th] at 15; *Craig,* 84 Cal.App.4[th] at 420.  Thus, there was a valid agreement between GE and Wilkins.

The C&I Agreement was made in consideration of Wilkins' employment at Enron Wind.  (Brace Decl., Exh. B at p. 1.)  Wilkins worked for Enron Wind (and later GE), and received compensation, until he voluntarily resigned on December 1, 2002.  (Brace Decl., at ¶ 5.)  Thus, Enron Wind and GE fully performed in accordance with the C&I Agreement.

Not surprisingly, the terms of the C&I Agreement were similar to those of the EIPI Agreement.  Pursuant to the C&I Agreement, "all Invention Ideas created or developed by [Wilkins], alone or with others, during the course of [his] employment with [Enron Wind], are works for hire and therefore the property of [Enron Wind]."  (Brace Decl., Exh. B at p. 2.)  Further, Wilkins agreed "upon [Enron Wind's] request and without the need for further

---

[9]    The C&I Agreement states that it "shall be binding on [Wilkins] and [his] successors and heirs, and shall inure to the benefit of the Company's successors and assigns."  (Brace Decl., Exh. B at p. 2.)  Further, under general assignment law, the assignee steps into the shoes of the assignor for purposes of a contract.  *See Manson, Iver & York v. Black,* 176 Cal.App.4[th] 36, 49 (2009); *Boyajian v. New Falls Corp.,* 564 F.3d 1088, 1091 (9th Cir. 2009); *Yang v. Home Loan Funding, Inc.,* Slip Copy 2010 WL 670958, * 7 (E.D. Cal. 2010).

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**

1  consideration, to execute any and all documents and take such actions which may be necessary

2  in [Enron Wind's] judgment to assign all rights to any Invention Idea to [Enron Wind]."  (*Id.*)

3  As discussed, GE stepped into Enron Wind's shoes, and thus, Wilkins was required to assign to

4  GE any rights he claimed in the '565 and '985 Patents that were developed during his

5  employment with Enron Wind or GE.

6          If the C&I Agreement were to govern, Wilkins' refusal to assign and his illicit assertion

7  of ownership discussed above would constitute a breach of that agreement.  (*See* Brace Decl.,

8  Exh. B.)  Also, for the same reasons discussed above, GE has been damaged as a result of

9  Wilkins' conduct.  (*See* Section III(A)(1), *supra*.)

10         Assuming the C&I Agreement, and not the EIPI Agreement, were applicable, the

11  evidence is clear that Wilkins has breached his obligations to GE under the C&I Agreement and

12  caused damage to GE.  Thus, GE is likely to succeed on the merits of its breach of contract claim

13  pursuant to the C&I Agreement.

14         **3.        California Statutory and Common Law—Work For Hire Doctrine**

15         In addition to the breaches of the EIPI Agreement and C&I Agreement, Wilkins' refusal

16  to assign is also a violation of California statutory and common law.  Such is the subject of GE's

17  declaratory relief claim.

18         It is clear there is an actual, present controversy over whether GE or Wilkins owns the

19  rights to the inventions that are the subject of the '565 and '985 Patents.  Wilkins claims

20  ownership of the patents, has licensed (and offers to license) the patents to others without GE's

21  knowledge or consent, and has even demanded that GE obtain a license from Wilkins.  (Glynn

22  Decl., Exhs. A, A1 and C1, and ¶ 3.)  GE claims it is the owner and that Wilkins has no

23  ownership rights.  (*See* Docket No. 1.)  The parties' respective rights under California statutes

24  and common law are a proper subject for a declaratory relief claim.  *See* Cal. Code of Civ. Proc.,

25  § 1060; *Abbott v. Los Angeles*, 53 Cal.2d 674, 678 n. 2 (1960).  Thus, the only question is

26  whether GE is entitled to the requested relief.

27         California Labor Code section 2860 states:  "[e]verything which an employee acquires by

28  virtue of his employment, except the compensation which is due to him from his employer,

1   belongs to the employer, whether acquired lawfully or unlawfully, or during or after the

2   expiration of the term of his employment."  Recent California case law has confirmed that

3   Section 2860 applies to inventions created as part of employment.  *See Cappa v. Crosstest, Inc.,*

4   2008 WL 821637 (Cal. App. 2008) (unpublished opinion).[10]  In *Cappa*, the California court of

5   appeal held that Section 2860 applies "to inventions made by an employee who has been hired to

6   develop the invention."  *Id.* at * 10; *see also Famous Players-Lasky Corp. v. Ewing,* 49 Cal.App.

7   676, 679-80 (1920) ("'An employer who conceives the result embraced in an invention or the

8   general idea of a machine upon a particular principal, and in order to carry his conception into

9   use necessarily employs manual dexterity, or even inventive skill, in the mechanical details and

10  arrangement, is nevertheless the inventor and entitled to patent as against the servant who was

11  the mere instrument through which he realized his idea.' [Citations.]").  Thus, the *Cappa* court

12  held that the employee could not state a conversion claim against his employer for an invention

13  that was created during the employee's employment.  2008 WL 821637 at * 11.

14       Further, under California common law, where an employee is "hired to invent," the

15  employee is obligated to assign the invention to his or her employer.  *See Aero Bolt & Screw*

16  *Comp. of Cal., Inc. v. Iaia,* 180 Cal.App.2d. 728, 736 (1960) ("A synthesis of the rules relating

17  to such assignments would be either (a) where the employee is hired to invent (i.e., has a duty to

18  invent) or (b) where even though there was no duty to invent, that it was part of the employment

19  contract that if there should be an invention, that the employee would assign the title thereof to

20  the employer.  [Citation.]"); *see also Daniel Orifice Fitting Comp. v. Whalen,* 198 Cal.App.2d

21  791, 798 (1962) ("Where a person is employed to design improvements to the product of his

22  employer, or to design new products for his employer, and he does so, he may not use the results

23  of such work for his own use and benefit, and particularly not to the detriment of his employer.

24  [Citations.]"); *Solomons v. United States,* 137 U.S. 342, 346 (1890) ("If one is employed to

25  devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot,

26

27  [10]   Although an unpublished opinion, *Cappa* is persuasive authority on how a California court
    would interpret California Labor Code section 2860.  Given the absence of any recent authority
28  interpreting Section 2860 in this context it is appropriate for the Court to consider *Cappa*.

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1  after successfully accomplishing the work for which he was employed, plead title thereto as

2  against his employer.  That which he has been employed and paid to accomplish becomes, when

3  accomplished, the property of his employer.  Whatever rights as an individual he may have had

4  in and to his inventive powers, and that which they are able to accomplish, he has sold in

5  advance to his employer.") *cited with approval in Daniel Orifice Fitting Comp., supra.*

6      Here, Wilkins was specifically hired to "design, develop[], install[] and test[] . . . the

7  Enron Wind Dynamic VAR system" and "interact with the Advanced Technology Group as

8  needed to provide input for new technology developments including control system, converter

9  system, pitch system, generator system and overall wind turbine design."  (Brace Decl., Exh. A

10  at p. 1.)  The '565 Patent, which was for a "[c]ontinuous reactive power support for wind turbine

11  generators," was a direct result of Wilkins' (and other Enron Wind / GE employees') work for

12  Enron Wind and GE—indeed, Wilkins disclosed his invention that led to the '565 Patent to GE

13  on May 31, 2002 (the date he allegedly thought up the idea).  (McGinness Decl., Exhs. A and B.)

14   As for the '985 Patent, the ITC Administrative Law Judge specifically found that Wilkins "was

15  the lead power systems electrical engineer in California, and his job was to develop new designs

16  for low voltage ride-through" and as part of his work he allegedly communicated with GE's

17  German engineers to develop the '985 Patent.  (McGinness Decl., Exh. D at p. 118.)  Thus,

18  Wilkins was hired to design, and designed as part of his employment, the technology subject to

19  the '565 Patent; and, although GE disputes that Wilkins was a co-inventor of the '985 Patent,

20  any work that would allow him to claim inventorship was work for which he was hired.  Thus,

21  he was required to assign all rights to such patents to GE.  Instead, Wilkins received a salary to

22  help invent technology for GE, but nevertheless has improperly asserted ownership to the

23  substantial detriment of GE.

24      The evidence is clear that GE is entitled to a declaration under California statutory and

25  common law that GE is the owner of the inventions subject to the '565 and '985 Patents and

26  Wilkins is required to assign any rights to those inventions to GE.  Thus, GE is likely to succeed

27  on the merits of its declaratory relief claim.

28  / / /

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

**B.      GE Will Suffer Irreparable Harm in the Absence of Preliminary Injunctive Relief**

"'In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. . . .'" *Campbell Soup Comp. v. Conagra, Inc.*, 977 F.2d 86, 91 (3rd Cir. 1992).  The amount of harm is irrelevant if the harm is irreparable.  *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).  "One of the fundamental and valuable aspects of a patent is the right to exclude others from using one's invention.  *See* 35 U.S.C. § 154. . . . [The] inability to control the use of its invention will constitute irreparably injury."  *Concrete Washout Systems, Inc. v. Washout Systems, LLC,* 2008 WL 5411965, * 3 (E.D. Cal. 2008) (unpublished opinion).[11]  Other examples of irreparable harm include:  the "threatened loss of prospective customers or goodwill," *Stuhlbarg Int'l Sales Comp., Inc. v. John D. Brush and Comp., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); and multiple lawsuits resulting from the absence of preliminary relief, *Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2nd Cir. 1996).

Here, GE seeks to preserve the status quo by preventing Wilkins from licensing the technology subject to the '565 and '985 Patents during the pendency of this action.  Wilkins has already licensed the technology subject to the '985 Patent without GE's knowledge or consent to GE's competitor, MHI, and is actively seeking to license the technology to anyone willing to pay.  (*See* Glynn Decl., at ¶ 3 and Exhs. A, A1 and C1.)  The harm to GE resulting from violation of its patent rights is, as a matter of law, irreparable.

Because legal remedies are insufficient, California courts will specifically enforce contracts to convey patent rights.  *See Hercules Glue Co. v. Littooy*, 25 Cal.App.2d 182, 186 (1938) ("Equity will specifically enforce the performance of a contract to convey patent rights.") *cited with approval in Ringfree USA Corp. v. Ringfree Comp., Ltd.,* 2008 WL 4691046 * 3 (C.D. Cal. 2008) ("Contracts to assign patent rights are specifically enforceable in California.")

---

[11]  Although not precedents, unpublished opinions from other district courts provide "insight as to how [other] federal court[s] have dealt with the issue."  *Lopes v. Vieira,* 688 F.Supp.2d 1050, 1062 n. 5 (E.D. Cal. 2010).

1    (unpublished opinion).  Thus, California courts recognize that where patent rights are at issue,

2    monetary damages are insufficient to compensate for a breach of an obligation to assign.  Here,

3    Wilkins' ongoing efforts to license GE's patents to third parties continue to harm the value of the

4    patents while the case is pending.  *See Concrete Washout Systems, Inc.,* 2008 WL 5411965 at * 3

5    ("If unauthorized persons or entities use CWS' proprietary boxes, that use diminishes the value

6    of CWS' proprietary rights."); *Oakley, Inc. v. Sunglass Hut Int'l,* 2001 WL 1683252, * 11 (C.D.

7    Cal. 2001) (unpublished opinion) ("If Defendants are permitted to continue to sell their blue and

8    green colored sunglass lenses during the pendency of this lawsuit they will erode Oakley's

9    exclusivity and goodwill associated with these products.").  GE is entitled to the patents as they

10   existed in 2002 when they were created for GE's benefit, not diminished by illicit license grants

11   at Wilkins' whim.  *See Deckert v. Independence Shares Corp.,* 311 U.S. 282, 290 (1940)

12   (preliminary injunction appropriate to prevent "dissipation or depletion" of assets at issue in

13   litigation).

14          Further, if Wilkins licenses the technology to third parties (as he has already done once

15   and is offering to do for others) then those third parties will not seek the same license from GE

16   although GE is the rightful owner of the patents.  *See Stuhlbarg Int'l Sales Comp., Inc.,* 240 F.3d

17   at 841 (loss of customers constitutes irreparable harm).  Similarly, if Wilkins licenses the

18   technology to third parties for substantially less than what GE is offering to its licensees,[12] such

19   underbidding would destroy the goodwill GE has developed with its own licensees who are

20   paying a fair price for their licenses.  *See Concrete Washout Systems, Inc.,* 2008 WL 5411965 at

21   * 3 ("Irreparable harm arises from the chilling effect on Plaintiff's potential licensees who would

22   be faced with competing with Defendants while it does not pay for, or comply with, its license.

23   [Citations.]").  In addition, if Wilkins licenses the technology to other wind turbine competitors

24   (as he has already done with MHI), they will be able to offer the same GE technology, and usurp

25   orders from customers that desire GE's technology that is the subject of the disputed patent

26

27   [12]   Despite GE's request, Wilkins refused to disclose the terms of the MHI license.  (Glynn
     Decl., at ¶ 3.)

28

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1   rights.  Thus, if Wilkins is not enjoined, GE would likely lose customers and goodwill, which

2   constitutes irreparable harm.  *See Stuhlbarg Int'l Sales Comp., Inc.,* 240 F.3d at 841.

3          Finally, for each license Wilkins grants to third parties, GE will have to initiate a separate

4   lawsuit against those individuals to void the licenses and for patent infringement.  Forcing GE to

5   participate in multiple lawsuits to protect its patent rights constitutes irreparable harm.[13]  *See*

6   *Savoie,* 84 F.3d at 58; *see also Kowalski v. Mommy Gina Tuna Resources,* Slip Copy 2009 WL

7   856006, *1 (D.Hawai'i 2009) ("As the patent holder, Mr. Kowalski has a right to license without

8   having to pursue litigation, or if he chooses to produce his invention himself, he has the right to

9   do so unhampered by infringing competitors.").  Also, Wilkins' continued violation of GE's

10  patent rights (by offering licenses to any willing third parties), and his encouragement of third

11  parties (i.e., MHI and Wilkins' other prospective customers) to also infringe GE's patent rights

12  constitute irreparable harm.  *See Apple Inc. v. Psystar Corp.,* 673 F.Supp.2d 943, 950 (N.D. Cal.

13  2009) ("monetary damages would not prevent Psystar from continuing to infringe Apple's

14  copyrights and violate the DMCA in the future, and will not prevent third-parties from infringing

15  Apple's copyrights[.]"); *Kowalski,* 2009 WL 856006 at * 1 ("Where, as here, there is a

16  continuing risk of future infringement, and '[b]ecause the principal value of a patent is the

17  statutory right to exclude, the nature of the patent grant weighs against holding that monetary

18  damages will suffice to make the patentee whole.'  [Citation.]").

19      **C.     The Balance of Equities Tip in GE's Favor**

20          "Before granting an injunction, a district court must balance the relative harm to the

21  parties, i.e., the potential injury to the plaintiff if an injunction does not issue, versus the

22  potential injury to the defendant if the injunction is issued.  [Citation.]"  *Novartis Consumer*

23  *Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596

24  (3rd Cir. 2002).

25

26  _____
    [13]   It should also be noted that third parties may be harmed by Wilkins' actions as they would be
27  forced into litigation with GE over the validity of their license with Wilkins.  If Wilkins fails to
    disclose GE's ownership rights (as Wilkins fails to do on his website), third parties may agree to
    a worthless license and become embroiled in a patent infringement lawsuit.
28

PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION

1   GE is only seeking a narrow preliminary injunction to prevent further infringement of

2   GE's patents by unauthorized licenses pending a trial on the merits.  As discussed, there will be

3   significant irreparable harm to GE if Wilkins is not enjoined.  On the other hand, Wilkins will

4   suffer no harm—and certainly no harm of which he has a right to complain.  One who

5   wrongfully appropriates the intellectual property rights of another has no equities to weigh.

6   Wilkins knew that GE asserted ownership in its patents and had a patent infringement

7   suit against MHI.  Nevertheless, Wilkins, without GE's knowledge and consent, entered into a

8   collusive licensing agreement to destroy GE's patent rights.  (Glynn Decl., at ¶ 3.)  Wilkins has

9   also misrepresented to the world on his website that he is the owner of GE's patents and is

10  willing to license the technology, which has the added effect of subjecting third parties to

11  potential infringement suits by GE.[14]  (*Id.*, Exhs. A and A1.)  Only a preliminary injunction can

12  stop Wilkins from continuing his inequitable conduct.

13  **D.      Injunctive Relief is in the Public's Interest**

14  The public has a strong interest in protecting intellectual property rights, including

15  patents.  *See Apple, Inc.,* 673 F.Supp.2d at 950; *Oakley, Inc.,* 2001 WL 1683252, * 12 ("In patent

16  cases there is an important public interest in favor of protecting the rights secured by a valid

17  patent.").  Here, GE is merely seeking to protect its interests in its patents that are properly filed

18  with the U.S. Patent and Trademark Office.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25

26  [14]   GE is the legal owner of the '565 and '985 Patents as they are assigned on their face to GE.
(McGinness Decl., Exhs. A and C.)  Thus, any third party who licenses GE's patents from
Wilkins without GE's consent does so at the risk that GE will sue them for patent infringement.

27  *See Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1334 (Fed. Circ. 2002)
(court of appeal rejected licensee's claim that it was a bona fide purchaser of a patent license and

28  was entitled to keep license even though licensor had no authority to grant license).

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**

1   **IV.**   <u>**CONCLUSION**</u>

2          For the foregoing reasons, GE respectfully requests that the Court grant GE's motion for

3   preliminary injunction and issue an injunction against Wilkins.  A form of order is filed

4   herewith.

5          Dated: July 9, 2010

                                                    GLYNN & FINLEY, LLP
6

7                                                   By_____/s/ Jonathan A. Eldredge_____
                                                       Attorneys for Plaintiffs General Electric
8                                                      Company and GE Wind Energy, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' MEMO. OF P&A IN SUPPORT OF MOT. FOR PRELIMINARY INJUNCTION**