1

2

3

4

UNITED STATES DISTRICT COURT

5

EASTERN DISTRICT OF CALIFORNIA

6

7

| | |
|---|---|
| GENERAL ELECTRIC COMPANY, | 1:10-cv-00674-OWW-JLT |
| Plaintiff, | MEMORANDUM DECISION REGARDING PLAINTIFF'S MOTION TO FOR PRELIMINARY INJUNCTION (Docs. 15, 16) |
| v. | |
| THOMAS WILKINS, | |
| Defendant. | |

14

**I.  INTRODUCTION.**

15

**A. Plaintiff's Allegations**

16

Plaintiff General Electric Company("Plaintiff") brings this

17

action against Defendant Thomas Wilkins ("Defendant") for damages

18

and injunctive relief.  According to Plaintiff's complaint,

19

Plaintiff is a developer of energy technologies and the holder of

20

U.S. Patent Nos. 6,921,985 ("'985 Patent") and 6,924,565, ("the'565

21

patent").[1]  Defendant is listed as one of seven inventors of the

22

'565 patent and asserts that he is an unnamed co-inventor of the

23

'985 patent.  Defendant asserts an ownership interest in both

24

patents.

25

Defendant was employed as an electrical engineer by Enron Wind

26

Corp. ("Enron"), Plaintiff's predecessor in interest,

27

28

---

[1] Only allegations common to Plaintiff's original complaint and first amended complaint are included in this summary.

**1**

intermittently from approximately April 1998 to May 2002. Defendant's job responsibilities while employed by Enron included the design, development, installation and testing of wind turbine generators.  Enron filed for bankruptcy protection in 2002. In May 2002, Plaintiff purchased Enron's assets, including its intellectual property.

Defendant became Plaintiff's employee in May of 2002. Defendant served as Plaintiff's lead power systems electrical engineer in California, and his job was to develop new designs for wind turbine equipment.  On May 31, 2002, Defendant first conceived the invention underlying the '565 patent.  Plaintiff does not allege when the invention underlying the '985 was first thought of, or who first thought of it. Defendant voluntarily resigned from Plaintiff in December 2002.

Plaintiff applied for the '565 and '985 patents after Defendant terminated his employment with Plaintiff.  In February 2004, Plaintiff requested that Defendant sign documents in connection with Plaintiff's application for the '565 patent, but Defendant refused.  Defendant has never signed an assignment expressly assigning the '565 patent to Plaintiff, despite Plaintiff's requests that he do so.  Plaintiff did not seek an assignment from Defendant in connection with the '985 patent.

In 2009, Defendant purported to license the '985 patent to one of Plaintiff's competitors.[2]   In May 2010, Defendant informed Plaintiff that he was offering to license the '565 patent to

---

[2]  On February 11, 2011, the court granted a motion to intervene filed by Mitsubishi Heavy Industries, Ltd., and Mitsubishi Power Systems Americas, Inc., the competitors Defendant purported to grant licenses to.

**2**

others.  Defendant refused Plaintiff's request to cease and desist such conduct.

**B. Procedural History**

Plaintiff filed a motion for preliminary injunction on July 9, 2010. (Docs. 15, 16).  On July 12, 2010, Plaintiff filed an *ex parte* application requesting that the court advance the hearing on its motion for preliminary injunction to August 16, 2010.  (Doc. 23).[3]

Defendant filed a motion to dismiss Plaintiff's original complaint on July 15, 2010; the hearing on the motion was set for September 27, 2010.  (Doc. 26).  On July 20, 2010, Defendant filed an *ex parte* motion seeking to "suspend briefing on the Motion for Preliminary Injunction" until after the hearing on Defendant's motion to dismiss.  (Doc. 27).[4]  Defendant's *ex parte* motion expressed Defendant's hope that resolution of the motion to dismiss would moot Plaintiff's motion for preliminary injunction. (Doc. 27 at 2).

On July 21, 2010, the court issued a minute order setting a scheduling conference for July 22, 2010 in order to discuss resolution of the parties' respective *ex parte* requests.  (Doc. 28).  After conducting the July 22 scheduling conference, the court issued a minute order that directed Plaintiff to file a motion for a temporary restraining order ("TRO") by July 26, 2010 and set a hearing for Plaintiff's motion for August 6, 2010.  (Doc. 29).  The

---

[3] Local Rule 230(b) provides a twenty-eight day notice requirement.  E.D. Cal. R. 230(b).  A hearing date on August 16, 2010 would have provided Defendant thirty-eight days notice.

[4] Defendant's motion also advanced opposition to Plaintiff's request to advance the hearing on Plaintiff's motion for preliminary injunction.  (Id).

minute order also directed the parties to complete limited reciprocal depositions, "preferably" by August 3, 2010. (Id.).

On July 26, 2010, Plaintiff filed a motion seeking a TRO and supporting documents. (Docs. 30, 31, 32, 33). On July 30, 2010, the parties submitted a stipulation pursuant to which Plaintiff agreed to withdraw its TRO application and cooperate with Defendant on various scheduling matters in exchange for Defendant's agreement to refrain from certain conduct. (Doc. 37). The court signed the stipulation on July 20, 2010 ("Stipulation"). (Doc. 38). The parties' Stipulation provided, in pertinent part:

> 1. GE's motion for a temporary restraining order is denied as moot;
>
> 2. The hearing date for GE's motion for preliminary injunction is taken off calendar pending the hearing on Wilkins' motion to dismiss;
>
> 3. The hearing date for Wilkins' motion to dismiss shall be set on a date agreeable to the Court at the earliest practicable opportunity, and the briefing schedule shall be pursuant to the local rules; and
>
> 4. The Court will set a hearing date on briefing schedule for GE's motion for a preliminary injunction at the hearing on Wilkins' motion to dismiss. The parties request that the hearing on GE's motion for a preliminary injunction be set within 35 days of the hearing on Wilkins' motion to dismiss.
>
> THEREFORE, the parties stipulate and agree that pending GE's hearing on the motion for a preliminary injunction that neither Wilkins, nor any person or entity acting in concert with Wilkins, shall:
>
> 1. Take any steps to license, purport to license, grant, or purport to grant rights to third parties in GE's Patent Nos. 6,924,565 and 6,921,985 (the "„565 and „985 Patents"); or
>
> 2. Modify or extend the license agreement with Mitsubishi Heavy Industries, Ltd. and/or related entities related to GE's '565 and '985 Patents; or
>
> 3. Engage in any conduct that would convey or tend to convey to third parties that Wilkins is licensing or will

**4**

license any ownership interest in the '565 or '985 Patents; or

4. Represent on his website or otherwise, unless under oath in judicially required or requested testimony, that he believes he has an ownership interest in the '565 and '985 Patents, or that he believes he has the lawful right to license under the '565 and '985 Patents.

(Doc. 38 at 3-4).

On September 2, 2010, Plaintiff filed an ex parte application to continue the hearing date on Defendant's motion to dismiss due to a scheduling conflict. (Doc. 40). Defendant filed vehement opposition to Plaintiff's request for continuance on September 7, 2010.[5] (Doc. 41). Defendant's opposition argued that Defendant only agreed to the Stipulation based on the assumption that his motion to dismiss would be heard on September 27. (Doc. 41 at 2). Defendant's opposition threatened noncompliance with the Stipulation if the hearing on Defendant's motion to dismiss was not held on September 27. (Doc. 41 at 4).

The court conducted a hearing on Plaintiff's ex parte request to continue the hearing on the motion to dismiss on September 16, 2010. In an attempt to effect a compromise solution to the parties' contentious dispute, the court issued a minute order that granted Plaintiff's request for continuance but also stated that the Stipulation would expire on September 27, 2010. (Doc. 45). On September 17, Plaintiff's counsel emailed the court and stated that Plaintiff would proceed with the September 27 hearing date for the motion to dismiss in order to preserve the terms of Stipulation,

---

[5] In the opposition to Plaintiff's ex parte request, Defendant's counsel accused Plaintiff's counsel of fraud in procurement of the Stipulation. The court rejected Defendant's accusation. Defendant's counsel also vowed not to agree to any further stipulations in this case. (Doc. 41 at 4).

pursuant to which the Stipulation was to remain in place until the preliminary injunction hearing.  (Doc. 46).  The court issued a minute order on September 17 which provided:

> In view of the Plaintiff electing to proceed to hearing on 9/27/2010, Stipulated [TRO] and Scheduling Order shall remain in full force and effect according to its original terms.

(Doc. 46).

The court heard Defendant's motion to dismiss on September 27, 2010.  During the hearing, the court announced its tentative decision to dismiss the contract cause of action pled in the complaint with leave to amend.  The court expressed its belief that although Plaintiff's complaint was not technically deficient under federal pleading standards, amendment of the complaint would be beneficial during later stages of the litigation:

> **The Court:** [D]o you agree that you should, in effect, separately state the [distinct breach of contract] claims you have?
>
> **Mr. Hanlon:** Your Honor, I think the claims are sufficiently alleged in the four causes of action that are stated. I don't believe there's a requirement under federal procedural law that each separate contractual breach be separately alleged as a separate cause of action. We could certainly do that if it's the Court's preference, but we don't believe that GE was required to so plead.
>
> **The Court:** I think that's probably right, but if it does -- what is alleged doesn't permit, if you will, the application of the statute of limitations to what is alleged to be breached, then you run the risk of having that barred if you don't amend.

(Doc. 87, Trans. at 16-17).  The court reiterated its view at the close of the hearing:

> I'll just close my thoughts by saying this. The reason that I mentioned amendment was because although it doesn't dictate the Court's pleading standards,

**6**

California law does utilize, to the extent that a
California contract is in dispute here, it does utilize
a primary rights theory to underlie pleading doctrine...

[I]t seems to me that there is more than one primary
right being asserted by GE in this lawsuit. There's a
contract right, three of them, and then there's some
intellectual property rights as well and then there is a
-- an employment property right also that is at dispute
and so down the line if GE wants to live dangerously, I
suppose they can do that...the matter stands submitted.
We'll get a decision out to you as soon as we can.

(Id. at 23-24).   A Memorandum Decision dismissing Plaintiff's

complaint without prejudice was entered on October 8, 2010.  (Doc.

58).[6]

On September 28, 2010, the court issued a minute order

vacating as moot the hearing date on Plaintiff's motion for

preliminary injunction; this minute order was a clerical error, as

there was no hearing date on calendar pursuant to the Stipulation.

(See Doc. 38 ¶2).

On October 1, 2010, the court held a status conference

regarding yet another contentious dispute among the parties-this

time, the parties' dispute concerned the status of their

Stipulation.  Defendant argued that because the court stated its

tentative decision to dismiss the complaint, and because the court

did not set a hearing date or briefing schedule for the motion for

preliminary injunction at the close of the hearing on the motion to

dismiss, the Stipulation "expired on its own terms."  (Doc. 52).

The court rejected Defendant's position, noting that the terms of

the stipulation enjoined Defendant from certain actions "pending

GE's hearing on the motion for preliminary injunction." (Doc. 108

---

[6] The formal order dismissing the original complaint was signed on October 18,
2010, after Plaintiff filed the FAC.

**7**

at 8).   The court held that the language of the Stipulation unequivocally specified that the life of the agreement was to extend until the hearing on Plaintiff's motion for preliminary injunction. (Doc. 108 at 8).   In response to Defendant's argument that there was no complaint on file, the court stated:

> [W]e have a complaint...under the injunction and declaratory relief claims for the alleged...interference with the alleged patent rights...at least those claims are going to survive until the next round or dispositive motion...As of today we do have a complaint because I've only announced a tentative ruling and I haven't made a dispositive order...We had an agreement that this interim order would be in effect until the hearing of the preliminary injunction motion, and that was to be within 35 days of the [September 27], which was the hearing date on the motion [to dismiss]

(Doc. 108 at 10).[7]   After the hearing, the court entered a minute order which provided in pertinent part: "The Court ORDERED stipulated temporary restraining order remains in full force and effect pending the hearing on the motion for preliminary injunction...Motion for Preliminary Inunction set for 10/18/2010 at 11:00 AM." (Doc. 53).   The Court's October 1, 2010 minute order directed Defendant to file opposition to Plaintiff's motion for preliminary injunction on or before October 8, 2010.   (Id.). Defendant filed opposition to Plaintiff's motion on October 8, 2010.   (Doc. 62).   Plaintiff filed a reply to Defendant's opposition on October 14, 2010.   (Doc. 77)

On October 12, 2010, the court ordered Plaintiff to submit an amended complaint by October 14, 2010 so that Defendant would have the amended complaint in his possession at the hearing on

---

[7] After the court explained its holding that the Stipulation remained in force, Defendant's counsel informed the court that Defendant would not comply with the court's ruling. (Id.).

**8**

1  Plaintiff's motion for preliminary injunction.  Plaintiff filed its

2  First Amended Complaint ("FAC") on October 13, 2010.  (Doc. 74).

3      The court heard Plaintiff's motion for preliminary injunction

4  on October 18, 2010 and stated orally on the record that it would

5  issue a written decision granting a preliminary injunction.  (Doc.

6  83).  The court directed Plaintiff to prepare proposed findings of

7  fact and conclusions of law.  (Id.).

8      Defendant submitted a request for leave to file supplemental

9  opposition to the motion for preliminary injunction on October 20,

10  2010; the court denied Defendant's request on October 21, 2010, as

11  the matter had been heard on notice. (Docs. 84, 86).

12      Plaintiff submitted proposed findings of fact and conclusions

13  of law on October 25, 2010.  (Doc. 94).  Defendant filed objections

14  to Plaintiff's proposed findings of fact and conclusions of law on

15  October 26, 2010.  (Doc. 95).

16                    **II.  LEGAL STANDARD**.

17      "A preliminary injunction is an extraordinary remedy never

18  awarded as of right." *Winter v. Natural Resources Defense Council,*

19  *Inc.*, 129 S. Ct. 365, 376 (2008) (citation omitted). "A plaintiff

20  seeking a preliminary injunction must establish that he is likely

21  to succeed on the merits, that he is likely to suffer irreparable

22  harm in the absence of preliminary relief, that the balance of

23  equities tips in his favor, and that an injunction is in the public

24  interest." *Id.* at 374 (citations omitted).  An injunction may only

25  be awarded upon a clear showing that the plaintiff is entitled to

26  relief. Id. at 376 (citation omitted) (emphasis added).

27  ///

28  ///

**9**

### III. **FINDINGS OF FACT**.

## A. Defendant's Employment With GE and Enron

1.   Enron Wind Corporation ("Enron") extended a written offer of employment to Defendant dated December 17, 2001 ("2001 Enron Offer Letter").  (Doc. 18, Brace Decl. at 1).  The title of the position offered to Defendant in the 2001 Enron Offer Letter was "Power Systems Engineer."   The 2001 Enron Offer letter described the responsibilities of a Power Systems Engineer as follows:

> Will  be  responsible  for  the  design,  development, installation, and testing of the Enron Wind Dynamic VAR system.   Duties  will  include  direct  interaction  with project  developers,  site  operators,  park  owners, utilities, Enron Wind Manufacturing and vendors.   Will help establish performance criteria, testing procedures, installation procedures, and product manuals data

> Will  work  to  assure  proper  electrical  design  of  all Ballance-of-Plant  (BOP)  items  including  pad  mount transformers,  electrical  infrastructure,  sub-station design   review   including   all   data   acquisition requirements.   Will  work  directly  with  Enron  Wing Execution group, and Enron Wing engineering.

> Will be responsible for the specification, and overall performance of the Variable Speed Drive Converters used on all Enron Wind Variable Speed turbines.  Duties will include specification system design, testing, and vendor qualification.  Design development engineering input for any in-house design is also expected.

> Will  interact  with  the  Advanced  Technology  Group  as needed to provide input for new technology developments including control system, converter system, ptich system, generator system, and overall wind turbine design.

(Doc. 18, Brace Decl., Ex. A at 1).   The 2001 Enron Offer Letter stated "As part of your terms of employment, you will be required to sign a Confidentiality and Inventions Agreement."  (Id. at 2).

2.   Defendant commenced employment with Enron in January 2002. (Doc. 18, Brace Decl. at 2; Ex. A at 4).   At some point in early

**10**

1   2002, Defendant signed the 2001 Enron Offer Letter. (Id.).
2   Pursuant to the terms of the 2001 Enron Offer Letter and Enron's
3   general business practice, Defendant was required to sign a
4   Confidentiality and Inventions Agreement ("Enron C & I Agreement")
5   as a condition of his employment. (Doc. 18, Brace Decl. at 2; Ex.
6   A at 2).

7

8   3.   In early 2002, Norland Brace, Enron's Director of Human
9   Resources, was involved in due diligence preparations in connection
10  with the proposed sale of Enron.   (Doc. 18, Brace Decl. at 2).
11  Mr. Brace was charged with ensuring that each of Enron's employees,
12  including its engineers, had signed Enron's C & I Agreement so that
13  Enron could present the agreements to prospective buyers.   (Id.).
14  When Mr. Brace was unable to locate a signed copy of Defendant's C
15  & I Agreement, he personally  took a copy of the Enron's C & I
16  Agreement along with other employment documents, including a copy
17  of the 2001 Enron Offer Letter; these documents comprised Enron's
18  "employment packet." (Id.).

19

20  4.  Defendant initially refused to sign the Enron C & I Agreement.
21  (Doc 18, Brace Decl. at 2).   Mr. Brace informed Defendant that
22  signing the C & I Agreement was a condition of his employment and
23  that he would be terminated if he did not sign the agreement.
24  (Id.).    Mr. Brace witnessed Defendant sign the Enron C & I
25  Agreement and the 2001 Enron Offer Letter;  Mr Brace's declaration
26  indicates that he witnessed Defendant sign these documents on
27  February 3, 2002.  (Id.).   The court takes judicial notice that
28  February 3, 2002 was a Sunday.

**11**

5.  A signed copy of Defendant's Enron C & I Agreement was sent by Enron to prospective buyers as part of Enron's due diligence requirement, along with the C & I Agreements of Enron's other employees.  (Doc. 18, Brace Decl. at 2).

6.  A signed copy of Defendant's Enron C & I Agreement cannot be located by Plaintiff.  (Doc. 18, Brace Decl. at 2).  Plaintiff has experienced problems locating documents from the set of records that should contain Defendant's signed Enron C & I Agreement, as such records have been moved off site.  (Id.; Doc. 17, Hunt Decl. at 2).

7.  Defendant worked for Enron from January 2002 until May 2002. (Doc 18, Brace Decl. at 2).

8.  On May 10, 2002, Plaintiff acquired certain of Enron's assets, including intellectual property related to Enron's wind turbine operations.  (Doc. 19, McGinness Decl. at 2; Doc. 63, Schulte Decl., Ex.  E at 5).   Pursuant to the purchase agreement, "rights...under any and all employment contracts" were expressly excluded from the assets Plaintiff purchased from Enron.  (Doc. 68, Schulte Decl. at 5).

9.  In 2002, David Hunt, GE's current Human Resources Manager, Global Mergers and Acquisitions, was part of the human resources team that was responsible for integrating Enron's employees into Plaintiff's business.  (Doc. 17, Hunt Decl. at 1-2).  As part of the integration process, all Enron employees were required to sign

**12**

various employment forms as a condition to employment with Plaintiff. (Id.). If any employee refused to sign the forms provided by Plaintiff, they would have been immediately terminated. (Id.).

10. Defendant commenced employment with Plaintiff as a Power Systems Engineer in May 2002. (Doc. 18, Brace Decl. at 3).

11. On May 29, 2002, Defendant signed a document entitled "The Spirit & Letter of Our Commitment" in which Defendant acknowledged that he had received various documents that comprised the guide to Plaintiff's employee policies ("Spirit and Commitment Letter"). (Doc. 17, Hunt Decl. at 2, Ex. B).   Plaintiff's business practice was to require employees to sign all documents that accompanied the Spirit and Commitment Letter at the same time.   (Doc. 17, Hunt Decl. at 2).  One of the documents Defendant acknowledged receiving by signing the Spirit and Commitment Letter was Plaintiff's Employee Innovation and Proprietary Information Agreement ("GE EIPI Agreement").  (Doc. 17, Hunt Decl. Ex. B).  Plaintiff is unable to locate a copy of the GE EIPI Agreement signed by Defendant.   (Doc. 17, Hunt Decl. at 2).

12.   The Spirit and Commitment Letter contains a provision which provides "I understand that every employee is required to comply with the policies described in the guide." (Doc. 17, Hunt Decl. at 2, Ex. B).

13.  Defendant resigned from Plaintiff's employ on December 1,

2002.  (Doc. 18, Brace Decl. at  3).

**B. The '565 Patent**

14.  On May 31, 2002 Defendant signed and submitted  to Plaintiff a document entitled "Record of Invention" for technology described as "Continuous WTG VAR Support and Prioritization."  (Doc. 19, McGinness Decl. Ex. B).  A second person, Nagwa Elkachouty, also signed the form as an inventor.  (Id.).  The Record of Invention stated that Defendant first thought of the invention on May 31, 2002 and indicated that the inventors' division was "General Electric Wind Energy."  (Id).

15.  On August 18, 2003, Plaintiff filed a patent application for the technology described in the Record of Invention. (See Doc. 26, Ex. 1 at 37; Doc. 19, McGinness Decl. at 2).  Plaintiff filed the patent application with an unsigned Inventor Declaration and Power of Attorney Form for Defendant. (See Doc. 26, Ex. 1 at 37).

16.   After  receiving  a  "Notice  to  File  Missing  Parts  of Nonprovisional Application" in November 2003, Plaintiff, through counsel,  sent  Defendant  a  letter  dated  February  10,  2004, requesting that Defendant sign an Inventor Declaration and Power of Attorney form in connection with the patent application. (Doc. 26, Ex. 1 at 38).  On February 11, 2004, Paul Mendonsa, Plaintiff's attorney of record for the patent application, spoke with Defendant on the phone and Defendant stated that he was not willing to sign the Inventor Declaration and Power of Attorney form.  (Id.).  Mr. Mendonsa received the unexecuted forms from Defendant on February 24, 2004.  (Id.).  On March 17, 2004, Plaintiff filed a petition

under 37 C.F.R. § 1.47(a) to continue the patent application in the name of Defendant.  (Id.).

17.   On August 2, 2005, United States Patent No. 6,924,565 B2 ("'562 Patent") issued for technology titled "Continuous Reactive Power Support for Wind Turbine Generators."  (Doc. 19, McGinness Decl. Ex. A at 1).   The technology disclosed in the Record of Invention established the basis for the '565 Patent.  (Doc. 19, McGinness Decl. at 2).  The '565 Patent named seven inventors, one of whom was Defendant and one of whom was Nagwa Elkchouty.  (Id.). Each of the inventors listed in the '565 Patent is a current or former employee of Plaintiff, and other than Defendant, each has assigned his or her rights in the patent to Plaintiff.  (Doc. 19, McGinness Decl. at 2).   "General Electric Company" is listed as the assignee on the '565 Patent.  (Doc. 19, McGinness Decl. Ex. A at 1).   The abstract to the '565 Patent provides:

> Real and reactive power control for wind turbine generator systems.   The technique described herein provides the potential to utilize the total capacity of a wind turbine generator system (e.g., a wind farm) to provide dynamic VAR (reactive power support).   The VAR support provided by individual wind turbine generators in a system can be dynamically varied to suit application parameters.

(Id.).

18.  Plaintiff has licensed and continues to offer licenses for the use of the technology subject to the '565 Patent.  (Doc. 19, McGinness Decl. at 2).

19.  On June 2, 2010, Defendant, through counsel, sent an email to

Plaintiff's counsel containing a document entitled "Notice of Non-Abandonment and Intent to License" ("June 2010 Notice"). (Doc. 20, Glynn Decl. at 2, Ex. C1). The June 2010 Notice stated that Defendant was "actively performing work in commerce by selling, licensing, engineering, and designing wind turbines and wind farms to utilize [the technology underlying the '565 Patent]." (Id. at Ex. C1 at 1).

## C. The '985 Patent

20. On July 26, 2005, United States Patent No. 6,921,985 B2 ("'985 Patent") issued for technology described as "Low Voltage Ride Through for Wind Turbine Generators." (Doc. 19, McGinness Decl. Ex. C at 1). Five inventors are named in the '985 Patent; Defendant is not one of them. (Id.). However, Defendant's name appeared on the application transmittal letter and cover sheet Plaintiff initially filed with the U.S. Patent and Trademark Office. (Doc. 64). Each of the inventors listed in the '985 Patent is a current or former employee of Plaintiff and each has assigned his or her rights in the patent to Plaintiff. (Doc. 19, McGinness Decl. at 2). "General Electric Company" is listed as the assignee on the '985 Patent. (Doc. 19, McGinness Decl. Ex. C at 1). The abstract to the '985 Patent provides:

> A wind turbine. The wind turbine includes a blade pitch control system to vary a pitch of one or more blades and a turbine controller coupled with the blade pitch control system. A first power source is coupled with the turbine controller and with the blade pitch control system to provide power during a first mode of operation. Uninterruptible power supplies coupled to the turbine controller and with the blade pitch control system to provide power during a second mode of operation. The turbine controller detects a transition from the first mode of operation to the second mode of operation and

16

1   causes the blade pitch control system to vary the pitch
    of one or more blades in response to the transition.
2   (Id.).

3

4   21.   On August 7, 2009, an Administrative Law Judge ("ALJ") for

5   the United States International Trade Commission issued an "Initial

6   Determination" which held that Defendant was an inventor "of the

7   subject matter of claim 15 of the '985 patent."  (Doc. 66 at 3).

8   On March 2, 2010 the United States International Trade Commission

9   affirmed the ALJ's finding that Defendant was an inventor of the

10  '985 patent, but held that because Defendant's name did not appear

11  on the face of the patent, he was not an "owner" of the patent.

12  (Doc. 67 at 7).

13

14  22.   On May 17, 2010, Defendant, through counsel, informed

15  Plaintiff's counsel that Defendant had purported to license the

16  technology subject to the '985 Patent to MHI.  (Doc. 20., Glynn

17  Dec. at 2, Ex. B).

18

19  23.  On June 2, 2010, Defendant, through counsel, sent an email to

20  Plaintiff's counsel containing a document entitled "Notice of

21  Non-Abandonment and Intent to License" ("June 2010 Notice").

22  (Doc. 20, Glynn Decl. at 2, Ex. C1).   The June 2010 Notice stated

23  that Defendant was "actively performing work in commerce by

24  selling, licensing, engineering, and designing wind turbines and

25  wind farms to utilize [the technology underlying the '985 Patent]."

26  (Id. at Ex. C1 at 2).

27  ///

28  ///

**17**

**D. Defendant's Recent Conduct**

24.  On July 30, 2010, the parties submitted a Stipulation pursuant to which Defendant agreed to refrain from certain conduct until Plaintiff's motion for preliminary injunction was heard.  (Doc. 37).  *Inter alia*, Defendant agreed not to:  (1) license or grant any rights in the subject patents to third parties; (2) engage in any conduct that would convey or tend to convey to third parties that Defendant is licensing or will license any ownership interest in the subject patents; or (3) represent on his website or otherwise, unless under oath in judicially required or requested testimony, that he believes he has an ownership interest in the subject patents  or that he believes he has the lawful right to license the subject patents. (See Doc. 38 at 3-4).   The court signed the Stipulation on July 20, 2010.   (Doc. 38).  On October 1, 2010, the court held a hearing to resolve a dispute regarding the parties disparate interpretations of the Stipulation.  (Doc. 53).  The court ordered that the Stipulation would remain in force pending a hearing on Plaintiff's motion for preliminary injunction.  (Doc. 53).  At the close of the hearing, Defendant's counsel informed the court that Defendant would not comply with the court's order.  (Doc. 108, Trans. at 10-11).

25.  On October 1, 2010, Defendant represented on his personal website that (1) he had the capacity to assign an interest the '985 patent; (2) entities interested in licensing "LVRT or POWER FACTOR CONTROL" technology should "contact [Defendant] directly to discuss;" and (3) "there is no pending restraining order or injunction preventing [Defendant] from licensing his rightful

**18**

technology." (Doc. 91, Eldredge Dec. Exs. B, B1). On October 20, 2010, Defendant modified his website by adding the text of the court's October 1 minute order and stating "if you would like to discuss licensing for terms for technologies contained in United States Patents 985 and 565 you will have to wait until this matter is handled with the court, and then terms can be negotiated. But come back to this web site from time to time because you never know. Things have a way of just working out for the benefit of all parties." (Doc. 91, Eldredge Dec. Ex. C).

# IV. <u>CONCLUSIONS OF LAW</u>

**A. Jurisdiction**

1. Jurisdiction over this action is proper pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

2. Equitable powers are an inherent part of the judicial power committed to the federal courts by Article III of the United States Constitution. *E.g. Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010)(citing *Pa. v. Wheeling & Belmont Bridge Co.*, 59 U.S. 460, 462 (1855)). District courts have broad latitude in crafting equitable relief; "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987). District courts also have inherent power to control their dockets and to promote efficient use of judicial resources. *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (citation omitted).

**19**

3. The court's dismissal of Plaintiff's original complaint with leave to amend did not render Plaintiff's motion for preliminary injunction moot, as the court and both parties were aware that Plaintiff intended to and did amend its complaint to clarify its breach of contract claims. An order of a district court dismissing a complaint with leave to amend leaves the suit pending for further proceedings. *E.g. Jung v. K. & D. Mining Co.*, 356 U.S. 335, 337 (1958) (citation omitted).  Where the district court expressly grants a party leave to amend its complaint, it is plain that the court does not intend to relinquish jurisdiction over the case. *See WMX Techs. v. Miller*, 104 F.3d 1133, 1137 (9th Cir. 1997) (dismissal with leave to amend was not a final appealable order).  A district court's dismissal of a complaint with leave to amend *is not* a dismissal of the underlying action. *Montes v. United States*, 37 F.3d 1347, 1350 (9th Cir. 1994) (noting distinction between dismissal of a complaint and dismissal of the underlying action); *De Tie v. Orange County*, 152 F.3d 1109, 1111 (9th Cir. 1998) (same); *Martinez v. Flores*, 299 F.2d 888.  Defendant's counsel's misrepresentation of this law and Defendant's voluntary and informed assumption of risk not to offer evidence to oppose the injunction at the October 18, 2010 hearing on preliminary injunction requires that Defendant be held accountable for this strategic misevaluation.

**B. Likelihood of Success**

4. California Labor Code Section 2860 provides:

> Everything which an employee acquires by virtue of his

**20**

> employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment

Cal. Lab. Code § 2860. California Labor Code section 2860 embodies the universally accepted principal that work product created by an employee belongs to the employer where the employee was hired to create such work product. *See e.g. Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 826 (Cal. 1979)(Mosk, J., concurring) (collecting cases such as *Zahler v. Columbia Pictures Corp.*, 180 Cal. App. 2d 582, 589 (Cal. Ct. App. 1960) (where an employee creates something as part of his duties under his employment, the thing created is the property of his employer"); *accord Treu v. Garrett Corp.,* 264 Cal. App. 2d 432, 436 (1968) (an invention created by an employee was held to belong to the employer because that was the very reason he was hired and paid); *Famous Players-Lasky Corp. v. Ewing*, 49 Cal. App. 676 (Cal. Ct. App. 1920) (same)); *Aero Bolt & Screw Co. v. Iaia*, 180 Cal. App. 2d 728, 736 (Cal. Ct. App. 1960) (where employee is hired to invent, employer owns invention); *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 216 (1933) (employer owns invention where employee is "hired or assigned to evolve a process or mechanism for meeting a specific need"). There is no dispute that Defendant was Plaintiff's statutory employee at all times relevant.

5. On or about May 31, 2002, Defendant signed a document entitled "Record of Invention" providing that he first thought of the technology underlying the '565 Patent on May 31, 2002. The Record of Invention indicated that the invention was developed for

1    "General Electric Wind Energy." (Doc. 19, McGinness Decl. Ex. B).

2    At the time Defendant signed the Record of Invention, he was

3    employed by Plaintiff as a Power Systems Engineer.[8]  As Defendant

4    conceived the technology underlying the '565 patent while employed

5    by Plaintiff for the purpose of engineering, designing, and

6    developing such technology, pursuant to California law, the

7    technology presumptively belongs to Plaintiff. *E.g. Treu,* 264 Cal.

8    App. 2d at 436; Cal. Lab. Code § 2860.[9]  In light of the state of

9    the record and applicable case law, Plaintiff has established a

10

11   [8] As a power system's engineer at Enron, Defendant's duties included "design,
12   development, installation, and testing of the Enron Wind Dynamic VAR system;"
     "[d]esign development engineering input for any in-house design;" and
13   "provid[ing] input for new technology developments including control system,
     converter system, pitch system, generator system, and overall wind turbine
14   design." (Doc. 18, Brace Decl., Ex. A at 1). There is no admissible evidence
     indicating that the scope of Defendant's job duties changed when he transferred
15   from Enron to GE, and it is reasonable to infer from the evidence on the record
     that Defendant's job duties remained substantially the same at GE.  Further,
16   Defendant's representations to the U.S. International Trade Commission reveal
     that his job at GE was to "develop new designs" for technology used in GE's
     business.  (Doc. 66, Schulte Decl. Ex. C at 4-5).
17

18   [9] The cases provided in Defendant's opposition, *Dubilier Condenser Corp.,* 289
     U.S. at 188 and *Banner Metals, Inc. V. Lockwood,* 180 Cal. App. 2d 728, 733 (Cal.
19   Ct. App. 1960) are of no help to Defendant.  Rather, these cases serve to
     reinforce the point that Plaintiff presumptively owns the subject technology in
20   this action, as the cases highlight the differences between Defendant's situation
     and an employee who independently develops technology on his own.  In *Banner*
21   *Metals,* the inventor was employed by his employer as an *order clerk,* developed
     his invention on his own time at his own expense, and prosecuted the patent for
22   his invention without involvement from his employer.  180 Cal. App. 2d at 731,
     736 (emphasis in original). Similarly, in *Dubilier,* the employees' invention was
23   not developed within the scope of their employment duties.  289 U.S. at 197.
     Here, the evidence demonstrates that Defendant developed the subject technology
24   within the scope of his employment.  *Williams v. Weisser,* 273 Cal. App. 2d 726,
     733-34 (Cal. Ct. App. 1969), cited by Intervenor Mitsubishi, is not persuasive
25   either.  The *Williams* Court specifically distinguished the lectures at issue in
     that case from inventions created by an employee hired to invent: "University
26   lectures are *sui generis*...they should not be blindly thrown into the same legal
     hopper with valve designs." *Id.* at 735 (citing *Daniel Orifice Fitting Co. V.*
27   *Whalen,* 198 Cal. App. 2d 791 (Cal. Ct. App. 1962)).  *Whalen* expressly recognizes
     that "[w]here a person is employed to design improvements to the product of his
28   employer, or to design new products for his employer, and he does so, he may not
     use the results of such work for his own use and benefit, and particularly not
     to the detriment of his employer."  198 Cal. App. 2d at 798.

high probability of success on its claim for declaratory relief regarding its ownership claim to the technology subject to the '565 patent.

6. According to Defendant's representations to the U.S. International Trade Commission, Defendant worked on developing the technology underlying the '985 patent as an employee of Enron Wind during 1999 and 2000.  (Doc. 66, Schulte Decl. Ex. C at 3). Defendant also represented to the U.S. International Trade Commission that in 2002, he was the lead power systems electrical engineer for GE and that his job was to develop new designs for low voltage ride-through.  (Id. at 4-5).  In connection with his duties as GE's lead power systems engineer, Defendant flew to Germany to work on the technology underlying the '985 Patent with other GE engineers. (Id.).  Accordingly, any technology invented by Defendant incorporated into the '985 Patent presumptively belongs to Plaintiff, as Defendant invented such technology in his capacity as an employee of Plaintiff's who was being paid to invent.  *E.g. Treu,* 264 Cal. App. 2d at 436; Cal. Lab. Code § 2860.  Plaintiff has established a high probability of success on its claim for declaratory relief regarding the '985 patent.[10]

**C. Irreparable Harm**

7. A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief; mere possibility of such injury is insufficient.  *E.g.*

---

[10] As Plaintiff has established a high probability of success on this equitable claim, it is unnecessary to discuss Plaintiff's contract claims.

**23**

*Winter*, 129 S.Ct. At 375.  Loss of customers and damage to goodwill may constitute irreparable harm.  *E.g. Rogers Group, Inc. v. City of Fayetteville,* 2010 U.S. App. LEXIS 26202*14 (8th Cir. 2010); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Services*, 425 F.3d 964, 970 (11th Cir. 2005); *Gallagher Benefit Servs. v. De La Torre*, 283 Fed. Appx. 543, 546 (9th Cir. 2008)(unpublished).[11]  A party's active interference with a patent holder's right to license and practice a patent supports a finding of irreparable harm protected by equity and injunctive relief, as the "attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified."  *See, e.g., Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992).

8.  In light of Defendant's conduct, licensing and offering to license technology claimed by Plaintiff, it is likely that Plaintiff will suffer lost customers and damage to its goodwill unless a preliminary injunction enjoins Defendant from further licensing of technology that is presumptively owned by Plaintiff.  According to Defendant, he has already intentionally and knowingly licensed a portion of the technology underlying the '985 Patent to

---

[11] In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94, (2006), the Supreme Court held that the Federal Circuit erred in adopting a categorical rule that permanent injunctive relief was available once a patentee established the validity of its patent and infringement by defendant. *Id.* at 392-94. *eBay* involved a permanent injunction, but the rule espoused therein "has been applied to preliminary, as well as permanent, injunctions, and has been read to limit the presumption of irreparable harm [based] solely upon the finding of infringement." *Aurora World, Inc. v. TY Inc.*, 2009 U.S. Dist. LEXIS 129128*146-47 (C.D. Cal. 2009) (collecting cases) but see *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009)(applying presumption in trademark case).

one of Plaintiff's competitors, and as recently as October 2010, Defendant offered to license the technology at issue in this action on his website despite the existence of a temporary restraining order prohibiting such conduct. Plaintiff has established a sufficient likelihood of irreparable harm to warrant a preliminary injunction. *See Concrete Washout Systems, Inc.*, 2008 WL 5411965 at * 3 (C.D. Cal. 2008) (granting injunction based on likelihood of damage to goodwill); *see also Oakley, Inc. v. Sunglass Hut Int'l*, 2001 WL 1683252, * 11 (C.D. Cal. 2001) (same).

**D. Equities**

9. The equities favor Plaintiff. Based on the current record, it does not appear that Defendant has rights in the subject technology sufficient to permit Defendant to license the technology to Plaintiff's competitors. Accordingly, an injunction does not impose a significant burden on Defendant. At most, Defendant risks losing licensing opportunities, for a limited period of time, for technology that he does not hold a patent to. Such opportunities are likely limited by prospective customers' reluctance to pay Defendant money for technology for which he does not hold a patent. Conversely, it appears that Plaintiff owns the subject technology but is at risk of losing customers, suffering diminished goodwill, and having to engage in litigation against multiple parties if Defendant is permitted to continue attempting to license the subject technology; indeed, Plaintiff is already engaged in litigation with a competitor to which Defendant has purported to license some of the subject technology.

**E. Public Interest**

10.   The public has a strong interest in protecting intellectual property rights. *See, e.g., Spansion, Inc. v. ITC*, 2010 U.S. App. LEXIS 25900*68 (Fed. Cir. 2010).

**F. Conclusion**

For the reasons stated, Plaintiff has established it is likely to prevail on the merits, that it is injured by the conduct of Defendant, that the threatened harm is irreparable, and that an injunction is in the public interest.

<u>**ORDER**</u>

For the reasons stated, Defendant Thomas Wilkins and those acting in concert with him, and those who have actual notice of this order, are enjoined and restricted from licensing or offering to license any interest in the technology described in the '565 and '985 patents, or from making any representation that Wilkins is presently legally entitled to license such technology, pending the entry of a final judgment in this action or further order of the court.

IT IS SO ORDERED.

**Dated:    May 5, 2011**                          **/s/ Oliver W. Wanger**
                                                UNITED STATES DISTRICT JUDGE