UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY, et al., | ) | Case No.: 1:10-cv-00674 LJO JLT |
| Plaintiffs, | ) ) | ORDER DENYING MITSUBISHI'S AND WILKINS' REQUEST FOR ELECTRONIC DISCOVERY |
| v. | ) ) | |
| THOMAS WILKINS, an individual | ) ) | |
| Defendant. | ) ) | |

Before the Court is a discovery dispute that was brought to the Court originally in late December 2011. (Doc. 261) The dispute centers upon 405 back-up tapes, referred to as the "Tehachapi tapes." These tapes store the content of a computer server operated by Wilkin's employer, Enron, before it was taken over by GE. Wilkins and intervener Mitsubishi, seek an order compelling GE to search these tapes using specified search criteria and produce any resulting documents.

The Court conducted telephonic conferences on January 5, 2012, February 3, 2012 and February 14, 2012. (Docs. 262, 290, 304) Because the Court finds that the tapes are not reasonably accessible and because there was not good cause shown to require GE to expend the resources necessary to make them reasonably accessible, the Court **DENIES** the request.

///

I.     Background

General Electric Company brought this action against Thomas Wilkins for damages and injunctive relief. At issue are two patents held by GE, U.S. Patent Nos. 6,921,985 ("985 Patent") and 6,924,565, ("the'565 patent"). When GE sought the patents, it listed Wilkins as one of seven inventors on the '565 patent but did not list him on the '985 patent application because GE contends he is not a co-inventor. Wilkins claims an ownership interest in both patents.

GE alleges that Wilkins was employed as an electrical engineer by Enron Wind Corp. from about April 1998 to May 2002. (Doc. 76 at 2) GE purchased Enron's assets in May 2002, which included Enron's patents and invention rights. Id. at 2. At that time, Wilkins became employed by GE. Id.  Also at that time, GE copied Enron's live server onto GE's own server. (Doc. 303-1 at 3) In addition, it acquired approximate 1 million hard copy documents from Enron's "central files."[1] Id.

GE claims that Wilkins was responsible for the design, development, installation and testing of wind turbine generators during the time he was employed by it and Enron. (Doc. 76 at 3) GE alleges that as a condition of his employment with Enron, Wilkins signed an agreement that all inventions developed by him during his employment and for a period after, belonged to his employer. Id. GE alleges that Wilkins signed a similar agreement upon his employment with GE. Id. at 5-6.

GE alleges that it applied for and received the '565 and '985 patents after Wilkins left GE's employ. (Doc. 76 at 6, 8) GE asserts that it alerted Wilkins to the '565 patent application and sought his cooperation in obtaining it. Id. at 7.  However, GE alleges that it received the patent '565 in 2005 without Wilkins' assistance because he refused to cooperate. Id.  GE claims that in May 2010, Wilkins asserted an ownership interest in the '565 for the first time and told GE that he was offering to license the '565 patent to others via a website. Id. at 7-8.

---

[1] In this litigation, GE reviewed each of these documents and produced "more than 30,000 pages from Enrol's central files located in Tehachapi,thousands of pages of documents with Mr. Wilkins' name on them (including many documents for which he was the custodian), and more than 7,000 documents that originated from Enron Wind in Germany, including communications between Enron Wind employees in Germany and others in Tehachapi." (Doc. 303-1 at 3)

GE alleges that it did not seek Wilkins' assistance in obtaining the '985 patent because it did not believe that he was an inventor of the underlying invention. (Doc. 76 at 8) GE claims that it received the '985 patent in July 2005 and it was not until 2009 that Wilkins first asserted an ownership right in it. Id. GE asserts that in 2009 Wilkins reported that he had licensed the patent to Mitsubishi and that he was offering to license it to others via a website. Id. As a result, GE demanded that Wilkins cease and desist from any further licensing efforts and demanded that Wilkins assign to it whatever interest Wilkins claimed in the patent. Id. Wilkins refused. Id.

### A. The "Tehachapi tapes" dispute

On December 29, 2011, counsel for Mitsubishi initiated a telephonic conference with the Court and counsel to discuss a discovery dispute related to backup tapes referred to as the "Tehachapi tapes." (Doc. 300) These tapes numbered more than 400 and were not organized in any fashion. (Doc. 301 at 1) GE had taken the position that the tapes were "inaccessible" as that term is used in Fed. R. Civ. P. 26(b)(2) and Mitsubishi desired an inspection to determine whether this was the case. (Doc. 300 at 1.) By this time, Mitsubishi's expert had spent two full days examining the tapes but Mitsubishi sought additional inspection time. Id. at 2.

Initially, GE indicated that it did not oppose an inspection that lasted longer than two days but did not anticipate that longer review would be necessary. (Doc. 300 at 12) Before the inspection occurred, the parties agreed that Mitsubishi's expert could use a program called "eSift" to restore the tapes onto a hard drive for the purpose of counting the number of "hits" that were found for key words. Id. at 10.

Also in advance of the inspection, GE sent Mitsubishi some photos of the tapes. (Doc. 300 at 8-9) The parties dispute whether the photos were intended to show a representative sample of the tapes. Id. Apparently, the photos showed only one tape of a certain type and the remaining tapes were of a second type. Id. Relying on the photos, Mitsubishi's expert brought to the inspection a piece of equipment that would read the second type of tape but not the first. Id. However, when he arrived at the inspection, it appeared that there was an equal number of each type. Id. Thus, the expert was able only to view a selection of tapes of the second type. Id.

Moreover, due to "equipment problems," the expert was unable to run the eSift program at all. Id. at 6, 7.

After the two-day inspection failed to yield any real results, counsel met and conferred as to whether GE would allow additional inspection time. (Doc. 300 at 3-7) To evaluate Mitsubishi's request for additional inspection time, GE made several requests including that Mitsubishi explain "the specific documents you expect could be recovered and have not otherwise been produced" and "what types of results that, if found, would justify further efforts on these old tapes, and . . . what MHI views as reasonable cost and burden associated with recovery, review, and production efforts on this data . . . ." Id. at 5. In response, Mitsubishi indicated that, "Among other things, the tapes may contain correspondence, e-mails, and other documents describing Mr. Wilkins' employment relationship with Zond[2] and Enrol, and the nature of the work Mr. Wilkins did for those entities." Id. at 3.

On January 5, 2012, the Court held the first telephonic conference on this dispute. (Doc. 262) In advance of this conference, GE and Mitsubishi submitted letters setting forth the issues. (Doc. 300, 303-1) Among other arguments, GE took the position that the cost of retrieving documents from the tapes was prohibitive. (Doc. 303-1 at 4) GE estimated that the cost would exceed $3 million. Id. at 4-5. Mitsubishi/Wilkins argued that the cost was a fraction of GE's estimate and argued that, at that juncture, they were seeking only another day or two to complete the inspection and emphasized that Mitsubishi would bear all associated costs. As a result, the Court ordered that the expert could have one more 8-hour day to complete his inspection. (Doc. 262)

The Court held the second telephonic conference on February 3, 2012. (Doc. 290) By this time, Mitsubishi's expert had completed the additional day of inspection and was able to review 12 tapes and claimed to have found "highly relevant e-mails" on them.[3] (Doc. 301 at 1)

---

[2]Zond was the predecessor of Enron.

[3]Notably, GE permitted Mitsubishi to have two experts on site throughout the entire 8-hour period thus doubling the amount of review conducted. (Doc. 303-2 at 3)

4

1 However, as it turned out, Mitsubishi had found documents of interest only on two of the twelve
2 tapes and had not actually viewed any e-mails but, instead, merely identified documents which
3 had Wilkins' name in the title. (Doc. 303-2 at 3) Though GE agreed to search the two tapes and
4 "to apply MHI-supplied search terms" to them, GE had discovered "that the vast majority of
5 these documents are irrelevant, and many remain in unreadable format, producing 'error'
6 messages' when accessed." Id. Likewise, GE noted that on the tapes were "large 'zip' files that
7 lock up the document vendor's computers and cause it to crash when attempts are made to open
8 the files." Id. GE clarified that 'its attempt to work cooperatively and diligently to produce the
9 requests documents is not a concession of relevance or materiality." Id.

10 At the hearing, Mitsubishi produced its expert, Jeff Parmet to assist the Court's
11 understanding of the situation. Mr. Parmet had provided a declaration before the hearing but at
12 the hearing was able to clarify many of the issues for the Court. (Doc. 302 at 3-4) Mr. Parmet
13 noted that of the 406 tapes, there were multiple "backups" or "partial backups" from various
14 points in time beginning as early 1998 or earlier and, in his opinion, as late as 2007. Id. at 3.

15 Mr. Parmet reported that it was possible to obtain information about what the tapes
16 contained without reviewing each tape. (Doc. 302 at 3-4) Mr. Parmet explained, in essence, that
17 when the tape back-ups were made, the tape writer hardware "read" from Enron's server and then
18 "wrote" the information contained on the server to the tape. Id. In this process, the tape writer
19 hardware also "wrote" onto the server's hard drive, details about the information that each tape
20 contained. Id. Mr. Parmet asserted that by "review[ing] a hard drive taken from the backup
21 server, [an forensic examiner could] extract from that hard drive any tape catalog files found."
22 Id. at 4. Of course, Mr. Parmet had not inspected the hard drive so could not be certain that the
23 catalog still existed on it.

24 Mr. Parmet clarified that the information obtained would be "folder-level" type of
25 information such as "email." Thus, Mitsubishi argued that it should be permitted to extract the
26 "tape catalog" from the backup hard drive. After this, Mitsubishi indicated it would look at the
27 folder-level information for each tape to see whether it appeared to contain pertinent information.
28

5

1  If it did, Mitsubishi would seek to require GE to restore the tape and search it.

2  At the hearing, though Mitsubishi and Wilkins claimed that they had a good faith belief that "crucial" documents would be uncovered on these tapes, it appeared to the Court that they did not have *any* basis for this belief. They could not identify any particular document they felt had not been produced already nor could they agree as to a narrowed time frame that would be most likely to produce material documents. Because it appeared that Mitsubishi and Mr. Wilkins were merely hoping that the tapes continued important information, rather than having a basis to believe that they did, the Court ordered Mr. Wilkins to provide a declaration that set forth "such information as what documents he seeks from the back-up "Tehachapi tapes," when these documents were created, why he believes these documents are contained on the tapes and the like, sufficient to allow the Court to evaluate whether there exists a good faith belief that the tapes contain information material to this litigation and which has not already been produced." (Doc. 290)

In his subsequently filed declaration, Mr. Wilkins merely recited basic information about his activities while employed by Enron and concluded thereon, that there would be important documents on the tapes. (Doc. 295 at 2-3) However, except for his report that he sent e-mails in late 2001 and early 2002, Mr. Wilkins provided absolutely no foundation for his stated belief that the important documents exist or that they exist on the tapes. He failed to claim in any manner that these important documents had not already been produced by GE. Similarly, he did not identify any particular document he had reason to believe was in existence that had not already been produced by GE from the hard copy documents obtained from Enron's central files or from the May 2002 image created from Enron's live server. Indeed, at the conference held on February 14, 2012, Wilkins' attorney and Mitsubishi's attorney confirmed that Wilkins had no more information that he could provide related to documents he believed existed on the tapes.

In response, GE asserted that it had already produced numerous documents to which Wilkins refers in his declaration. (Doc. 298 at 3-4) As to other possible documents Wilkins declared may be found on the tapes, GE contended that until now, Wilkins *has never claimed*

*that such documentation existed.* Id. As to other documents that may exist on the tapes, i.e. e-mail communications between Wilkins personal e-mail account and officials at Enron, GE argued that Wilkins provided no explanation why he simply did not retrieve them from his own e-mail account. Id. at 4.

## II.     Analysis

"Electronic documents are no less subject to disclosure than paper records." Rowe Entm't, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 428 (S.D.N.Y. 2002). This maxim applies equally to electronic documents that exist only on backup tapes. See Antioch Co. v. Scrapbook Borders, Inc., 210 F.R.D. 645, 652 (D. Minn. 2002); Simon Property Group L.P. v. MySimon, Inc., 194 F.R.D. 639, 640 (S.D. Ind. 2000). "The application of [the] various discovery rules is particularly complicated where electronic data is sought because otherwise discoverable evidence is often only available from expensive-to-restore backup media." Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 316 (S.D.N.Y. 2003).

According to Federal Rules of Civil Procedure Rule 26(b)(2)(B),

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

To evaluate whether the requested document production is unduly burdensome or expensive "turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)." Zubulake, at 319. Generally, backup tapes are considered to be "inaccessible." Id. The Zubulake court noted,

> " . . . Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes. Their transfer speeds also vary considerably. . . The disadvantage of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks." [Footnote] As a result, "the data on a backup tape are not organized for retrieval of individual documents or files [because] . . . the organization of the data mirrors the computer's structure, not the human records management structure." [Footnote] Backup tapes also typically employ some sort of data

  compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression

Id. Moreover, "Backup tapes must be restored using a process similar to that previously described, fragmented data must be de-fragmented, and erased data must be reconstructed, all before the data is usable. That makes such data inaccessible." Id. at 320.

    **A.**  **The Tehachapi tapes are not reasonably accessible**

  The parties agree that the "Tehachapi tapes" are made up of many "sets" of tapes that constitute full or partial backups of Enron's server at unknown intervals between 1998 and May 2002. The protocol employed by Enron when it made the full or partial backups, including, for example, the interval between backups or why a partial backup would have been made rather than a full backup, is not known.

  It is undisputed that GE imaged Enron's live server onto its own in May 2002. (Doc. 303-1 at 2-3) Thus, seemingly, the May 2002 image contains the entirety of Enron's records created since as early as 1998, except for those that had been deleted outright, deleted by "saving over the file" or some similar action constituting a deletion. To recover these deleted documents, each prior backup would have to be searched. This would mean also that every search would be significantly likely to produce mostly duplicate documents and the non-duplicate documents would be comparatively few.

  GE estimates that each tape has a capacity of 100 terabyte of uncompressed data. (Doc. 303-1 at 4-5) GE estimates that at least 3%[4] of the data on all of the tapes will register as a "hit" when Mitsubishi's search terms are applied to it. Id. Thus, GE estimates that the cost to process

---

[4] GE reports that when the German Enron documents were searched, the initial search terms revealed 260,000 documents. (Doc. 303-1 at 4, n 4) When the search terms were narrowed, 76,000 still were identified. From this, counsel for Mitsubishi and Wilkins selected 7,500 which GE reviewed and found that "a great number of them have absolutely no relevance to this case . . ." Id. Thus, it appears that even the narrowed search protocol carries with it a huge potential to identify nonresponsive documents. This conclusion is bolstered by GE's claim that the recent review of documents identified by the search terms on the two tapes targeted by the experts during the inspection, revealed that most were not responsive. (Doc. 303-2 at 3)

and host this amount of data approaches $2 million without regard for the cost of cataloging[5], indexing and searching each tape–which GE estimates would be more than $100,000. Id. Added to this, GE estimates that reviewing each of the documents for relevance and privilege would cost in the $16 to $24 million range. Id. On the other hand, the experience of attempting to retrieve documents from the tapes identified by Mitsubishi's experts after its inspection, reveals that this process is incredibly unwieldy and unproductive. (Doc. 303-2 at 3) Many of the files are in an unreadable format. Id. Others are compressed in zip files which crash the computers attempting to retrieve them. Id. Most others are simply not responsive. Id. Therefore, based upon the foregoing, the Court finds that GE has met its burden of demonstrating that the data contained on the backup tapes is not reasonably accessible.

**B.    Mitsubishi and Wilkins have not demonstrated good cause to require GE to search the Tehachapi tapes despite that they are not reasonably accessible.**

Mitsubishi and Wilkins have provided very little information upon which the Court may rely to conclude that good cause exists to require GE to produce the data despite that it is not reasonably accessible. Initially, Mitsubishi and Wilkins contended that GE should be required to search all 406 tapes. However, Wilkins modified this position at the February 4, 2012, conference to suggest that he would be willing to focus on the backup tapes created during certain periods during his employment. However, when he filed his declaration, it appears that the number of backups that he believes should be searched has expanded. For its part, Mitsubishi suggested at the February 14, 2012 conference that it would "focus" its search efforts on the last full backup created in the summer of 2001. Despite these suggestions, neither Mitsubishi nor Wilkins expressly abandoned the request to search all of the tapes.

Of greater concern to the Court is Mitsubishi's and Wilkins' failure to demonstrate any

---

[5] The parties have used the terms "index" and "catalog" without offering clear explanation what each means when using the term. For example, Mr. Parmet indicated that he could prepare a "catalog" of the tapes in about four hours which would provide a listing of folder-level information for each tape. On the other hand, GE estimates the cost to "catalog, index and search" the tapes would take four hours per tape. (Doc. 303-1 at 4) Clearly, the activity described by Mr. Parmet is a different, abbreviated process than the one described by GE. This is demonstrated by Mr. Parmet's clarification that developing the "catalog" he described, would be the first step *before* any search was conducted on any tape and would be done *only* to determine whether the tape was "search worthy."

concrete evidence or, even, any articulable basis upon which the Court can conclude, that there are any responsive documents remaining on the backup tapes that have not already been produced. Notably, GE produced responsive documents from the imaged Enron server and from the more than 1 million hard copy documents that it obtained from Enron's Tehachpi central files. Despite this, Mr. Wilkins' declaration does little more that assert that he worked for Enron so there *should* be documents pertinent on the backup tapes; undoubtedly, this is so. What he does not do, though, is provide any basis whatsoever–whether far-fetched or sounding in reason–for the Court to believe that he does not already have all of the pertinent documents. He does not say, "Enron always produced this type of document in this type of situation but GE has not given me this document." He does not claim that he recalls seeing, producing or being aware that someone else saw or produced, any document that has not already been produced.

This failure is most striking given the Court's clear and expressed concern that Mitsubishi and Wilkins were on a fishing expedition and appeared that they were merely *hoping* to find a "crucial," "highly relevant" or "material" document on the tapes rather than having any true basis to believe that one would be found. Indeed, when the Court inquired into the basis for counsel's expressed "good faith belief," they were unprepared and seemed slack-jawed at the thought of providing a foundation for this belief. Clearly, providing such a foundation would have gone a very long way toward demonstrating the good cause required for the Court to force GE to make the search *despite that* the tapes are not reasonably accessible. Their failure to make this showing speaks volumes.

## ORDER

Based upon the foregoing, the Court **ORDERS:**

1. The request by Mitsubishi and Mr. Wilkins to require GE to search the Tehachapi tapes, is **DENIED**.

IT IS SO ORDERED.

Dated:  **February 21, 2012**                              /s/ Jennifer L. Thurston
                                                                           UNITED STATES MAGISTRATE JUDGE