1

2

3

4

5

6

7

8             **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11
    GENERAL ELECTRIC COMPANY,              CASE NO. CV F 10-0674 LJO JLT
12  et.,

13                  Plaintiffs,            **ORDER ON PLAINTIFFS' MOTION FOR
                                           SUMMARY JUDGMENT**
14       vs.

15  THOMAS WILKINS,                        **ORDER ON DEFENDANT'S SUMMARY
                                           ADJUDICATION MOTION**
16                  Defendant.

17  _____/

18  AND RELATED COUNTERCLAIMS and
    INTERVENOR ACTION.
19  _____/

20

21                              **INTRODUCTION**

22       Plaintiffs General Electric Company and GE Wind Energy, LLC (collectively "GE") brought this

23  action to quiet title to two patents, U.S. Patent Nos. 6,924,565 ("565 patent") and 6,921,985 ("985

24  patent").  Defendant and counterclaimant Thomas A. Wilkins ("Mr. Wilkins"), a former employee of

25  GE and its predecessors, is one of seven named inventors of the 565 patent and claims to be an unnamed

26  inventor of the 985 patent.  In this motion, GE seeks judgment in its favor that pursuant to California

27  Labor Code Section 2860, GE is the sole owner of the 985 patent and the 565 patent, as between GE and

28  Mr. Wilkins.

                                        1

1    Mr. Wilkins cross-moves for partial summary adjudication of GE's remaining claims on two

2    grounds.  Mr. Wilkins argues that GE's claims are barred by the two-year statute of limitations, since

3    Mr. Wilkins refused to assign his inventive rights to GE in 2002 and 2004.  Next, Mr. Wilkins seeks

4    summary adjudication that California Labor Code Section 2860 does not obligate Mr. Wilkins to assign

5    any rights in his patents or inventions to GE as a matter of law, because mere employment is insufficient

6    to transfer an inventor's patent rights to his or her employer without an express agreement to assign.  In

7    addition to these affirmative arguments, Mr. Wilkins opposes GE's summary judgment motion by

8    asserting two main arguments.  First, Mr. Wilkins argues that GE is not entitled to Mr. Wilkins' assets

9    via the assets it acquired from Enron Wind in bankruptcy.  Second, disputed questions of material fact

10   preclude granting GE's summary judgment motion on its remaining claims.

11   Intervenors Mitsubishi, Ltd. and Mitsubishi Power Systems Americas, Inc. (collectively

12   "Mitsubishi") also filed an opposition to GE's summary adjudication motion.  Like Mr. Wilkins,

13   Mitsubishi asserts that GE's claims fail because Mr. Wilkins refused to assign any of his patent rights.

14   Mitsubishi contends that inventions belong to the inventor absent an agreement to the contrary.

15   Mitsubishi further contends that California Labor Code Section 2860 is inapplicable.  Mitsubishi further

16   submits that factual questions related to whether GE has unclean hands preclude summary adjudication

17   in GE's favor.

18   Having considered the parties' arguments, the admissible exhibits attached thereto, the applicable

19   case law and the record, this Court finds as follows.  Pursuant to California Labor Code Section 2860,

20   Mr. Wilkins had a duty to assign his rights to his inventions to his employer if he was "hired to invent."

21   Mere employment is insufficient to vest title to Mr. Wilkins' inventions in his employer.  Questions of

22   fact remain, however, as to whether Mr. Wilkins was hired to invent, to preclude summary judgment of

23   GE's remaining claims against Mr. Wilkins.[1]  As to the statute of limitations, questions of fact remain

24   as to when Mr. Wilkins breached his duty to assign, if any, to his employer and whether the statute of

25   _____

26   [1] Absent California Labor Code Section 2860, Mr. Wilkins would also have a duty to assign his rights to his
     inventions to his employer if he expressly assigned his rights to his employer through a contract separate from the employment
27   contract.  *See Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc*., 131 S.Ct. 2188 (2011).
     Whether Mr. Wilkins has this type of express contractual obligation to assign is no longer an issue in this action, as GE
28   dismissed with prejudice all of its contract claims against Mr. Wilkins.

2

1  limitations began to accrue in 2002.  The statute of limitations as to the 565 patent, however, did begin

2  to accrue no later than 2005.  Accordingly, GE's claims are time-barred to the extent that GE seeks

3  declaratory judgment that Mr. Wilkins had a duty to assign his rights in the 565 patent.  And although

4  the events of 2009 would not re-trigger GE's duty to assign claims as to the 985 patent, Mr. Wilkins'

5  license to a third party of part of the 985 patent would begin GE's claim as it relates to Mr. Wilkins'

6  licensing activities.  Finally, questions of fact remain as to whether GE has an interest in assets of Mr.

7  Wilkins' former employer, Enron Wind.

8  BACKGROUND

9  **Relevant Factual History**

10  **The Patents**

11  The two patents at issue relate to wind turbine generators, which transform wind energy into

12  electric power.  As the size of wind farms grew, utilities began to require wind farms to have the

13  capability to "ride through" disturbances on the power grid and to provide "reactive power" that helps

14  support the power grid.  The 985 patent, entitled "Low Voltage Ride Through ["LVRT"] for Wind

15  Turbine Generators" is directed to wind turbine structure and circuitry that provide "ride through"

16  stabalization in periods of voltage fluctuation.  The 565 patent, entitled "Continuous Reactive Power

17  Support for Wind Turbine Generators," is directed to real and reactive power control for wind turbine

18  generator systems, disclosing a technique for utilizing the total capacity of a wind farm to provide

19  dynamic reactive power support ("DVAR").

20  Mr. Wilkins contends that he developed inventions related to ride-through technology claimed

21  in the 985 patent and DVAR technology claimed in the 565 patent.  GE argues that the employer owns

22  any of Mr. Wilkins' alleged contributions to the patents pursuant to California Labor Code Section 2860.

23  **Mr. Wilkins' Employment With Zond 1998-2001**

24  In April 1998, Zond Energy Systems ("Zond") hired Mr. Wilkins as an Electrical Assembly

25  Technician at a wage of $10/hour.  After obtaining a college degree, Mr. Wilkins accepted a promotion

26  to the position of Electrical Engineer in August 2008.  His compensation increased to an annual salary

27  of $33,000.00.  During the next two years, Mr. Wilkins' salary increased three more times.

28  Zond was acquired by Enron Renewable Corporation in 1997.  In 1999, Mr. Wilkins began

1    receiving paychecks from Enron Wind without a new contract or job description.

2        In 1999 and 2000, Enron Wind or Zond assigned Mr. Wilkins to work on a wind farm project

3    known as Lake Benton II in Minnesota.  The Lake Benton II project was 100+ megawatt wind farm

4    featuring 128 Enron Wind wind turbine operator.  Florida Power & Light was Enron Wind's customer

5    and Northern States Power ("Northern States") was the utility responsible for defining certain

6    requirements the wind farm had to met.

7        Enron Wind or Zond and Northern States set ride-through and DVAR goals for the wind turbine

8    generators supplied to the Lake Benton II.  These specifications were outlined in a document identified

9    as B-5 Appendix.  The parties dispute whether the B-5 Appendix identified requirements for the Lake

10   Benton II wind farm or whether it identified recommendations that Enron Wind aspired to achieve.  The

11   parties further dispute whether Mr. Wilkins was hired to invent technology to meet the requirements of

12   the B-5 Appendix or whether Mr. Wilkins invented the technologies as he worked on solutions to the

13   specifications as part of his broader job responsibilities.

14       Mr Wilkins alleges that he developed technology claimed in the patents in 1999-2000 while he

15   worked at Lake Benton II.  He alleges that his contribution to claim 1 of the 565 patent "was conceived

16   during committee meetings between Enron Wind and Northern states Power in 1999." As to the 985

17   patent, Mr. Wilkins testified that he originated the concepts in Claim 1 [of the 985 patent] at Lake

18   Benton II to meet the requirements of the B-5 specification."  Mr. Wilkins further alleges that in 1998

19   and 1999, he conceived of ideas included in at least claims 1 and 15 of the 985 patent during his work

20   on Zond wind turbines while finding solutions to meet the B-5 specifications.

21       As outlined above, the parties dispute what Mr. Wilkins' responsibilities were while working

22   at Lake Benton II.  GE submits that Enron Wind was contractually obligated to meet the B-5

23   specifications and that, in his capacity as engineer for Enron Wind, Mr. Wilkins was sent to Lake Benton

24   II to make modifications to the wind turbine generators there so that Enron Wind could meet its

25   contractual obligations.  Mr. Wilkins acknowledges that he was responsible for "coming up with

26   solutions for the B-5 appendix" while he was stationed at Lake Benton II, but maintains that he was not

27   hired to invent and, therefore, had no duty to assign his rights to the patents to his employer.

28       It is undisputed that in his employment contract, from the time he began to work at an Electrical

4

Engineer in August 1998 until he resigned in May 2001, Mr. Wilkins' "primary responsibilities" were listed as:

1.      Will be responsible for the development of electrical infrastructure for wind turbines such as cables, junction, boxes, connectors/controller interaction.

2.      Will work with Electrical Engineers in the design and support of the variable speed control system components.  Interaction with outside vendors, local in-house manufacturing for Z-40 and Z-46A variable speed system.

3.      Will be involved in issues pertaining to performance of the system and integration.

4.      Will participate or support testing and publishing of data for electrical controls system and first production prototypes.

5.      Will support planning and design of electrical infrastructure for wind turbine projects.

6.      Interacts with construction and manufacturing and provide quality control.

Boudreau Decl., Ex. 8.  The parties submit further competing evidence as to what Mr. Wilkins roles and responsibilities were during this time period.

Mr. Wilkins alleges to have contributed to technology that made up part of the 565 patent and the 985 patent while at Lake Benton II.

## Mr. Wilkins' Employment at Enron Wind in 2002

Mr. Wilkins resigned on May 18, 2001.  Months later, he was rehired by Enron Wind as a "Power Systems Engineer."  Mr. Wilkins began working for Enron Wind on January 2, 2002.  His new job responsibilities includes "the design, development, installation and testing of the Enron Wind Dynamic VAR system;" "provid[ing] input for new technology developments including control system, converter system, pitch system, generator system and overall wind turbine design;" and "[d]uties will include specification, system design, testing, and vendor qualification.  Design and development engineering input for any in-house design is also expected."

The parties dispute whether Mr. Wilkins signed Enron's Confidentiality and Inventions Agreement ("C&I Agreement") when he returned to work at Enron Wind in 2002.  The C&I Agreement reads that all employees "agree...all Invention Ideas created or developed by me, alone or with others, during the course of my employment with the Company, are works for hire and therefore the property

5

1  of the Company," and confers power of attorney on Enron Wind to execute all patent prosecute

2  documents.  Mr. Wilkins alleges that he refused to sign that document.  GE points out that Mr. Wilkins

3  executed an offer letter in January 2002 that obligated him to sign the agreement.  And although his

4  signed C&I Agreement (executed a decade ago by a now-defunct company has not been located), Enron

5  Wind's former Director of Human Resources testified under oath that he specifically required Mr.

6  Wilkins to sign the document and that he actually saw the signed agreement.  Mr. Wilkins submits

7  evidence that calls that testimony into question.

8  **Mr. Wilkins' Employment at GE in 2002**

9  Enron Wind was acquired by GE in 2002.  GE submits that as with other employees, Mr. Wilkins

10 continued in the same role and job responsibilities as he had when Enron Wind and pursuant to that

11 employment contract.

12 In his first month of employment with GE, on May 31, 2002, Mr. Wilkins completed a "Record

13 of Invention," providing that he first thought of the technology underlying the 565 patent.  The

14 technology identified in the Record of Invention reflects the conception of ideas claimed in claim 6 of

15 the 565 patent.  GE submits that at the time he signed the Record of Invention, Mr. Wilkins was

16 employed by GE as a Power Systems Engineer, with responsibilities noted above, including developing

17 new ideas.  GE further points out that the Record of Invention indicates that the invention was developed

18 for "General Electric Wind Energy."

19 In May 2002, Mr. Wilkins alleges that he was sent to Germany to discuss his Lake Benton II

20 work with Enron Wind colleagues.  He further submits that while there, he discussed ideas ane

21 implementation of ride-through technology with his German colleagues that formed some of the ideas

22 included in the 985 patent.

23 **Mr. Wilkins Leaves GE, Refuses to Sign EIPIA**

24 Mr. Wilkins resigned from GE and ended his employment on December 1, 2002.  During his exit

25 interview, the GE human resources employee who conducted the interview noted in Mr. Wilkins' file,

26 in the area entitled "Employee Innovation and Proprietary Information Agreement," that Mr. Wilkins

27 "will not sign form.  Refused."  Mr. Wilkins submits that GE knew in December 2002 that Mr. Wilkins

28 never signed the form.  Mr. Wilkins points to emails from GE's in-house counsel and the GE manager

1  responsible for Employee Innovation and Proprietary Information Agreements ("EIPIA") that "Tom

2  never signed the EIPIA" and "Tom Wilkins never signed the patent rights form to GE."  These emails

3  were written in December 2002, after Mr. Wilkins terminated his employment.

4       GE disputes that Mr. Wilkins never signed the EIPIA.  GE submits that as a condition of

5  employment, all Enron Wind engineers were required to sign the EIPIA.  GE further submits testimony

6  that if an employee did not sign an EIPIA, then management would either have to agree to continued

7  employment absent the EIPIA or the employee would be terminated. GE submits testimony from

8  multiple GE employees who explain that no exception would have been made for Mr. Wilkins.  GE

9  further points to a contract signed by Mr. Wilkins in which Mr. Wilkins acknowledges that he agreed

10  to sign an EIPIA as a condition of employment.  Finally, GE points out that Mr. Wilkins completed his

11  Record of Invention while working for GE, which was consistent with signing the EIPIA.

12                **Mr. Wilkins Against Refuses to Sign Assignment Contract in 2004**

13       In February 2004, GE's patent attorney Paul Mendonsa ("Mr. Mendonsa") sent Mr. Wilkins a

14  patent application naming him as a co-inventor of the 565 patent, along with a cover letter that also

15  enclosed a patent declaration and an assignment form.  The letter stated that these two forms "require

16  your signature" and "assign[] your entire right and interest in the invention to General Electric

17  Company."  The assignment form that Mr. Wilkins was directed to sign would have "assign[ed] to

18  General Electric Company [Mr. Wilkins'] entire respective right(s), title(s), and interest(s) in and to the

19  invention and improvements [disclosed in the patent application]."  GE admits that Mr. Mendonsa

20  received a copy of Mr. Wilkins' 565 patent assignment document without Mr. Wilkins' signature.

21       Mr. Wilkins informed Mr. Mendonsa via telephone on February 11, 2004 that he would not sign

22  the declaration.  Two weeks later, Mr. Wilkins sent both the declaration and assignment forms back to

23  Mr. Mendonsa unsigned.  Mr. Wilkins submits that these actions made clear to GE that he had breached

24  the alleged duty to assign to GE all intellectual property developed in the course of his employment by

25  Enron and GE.

26                          **Patents Applications and Issue**

27       GE filed an application for the 985 patent in January 24, 2003.  GE identified Mr. Wilkins as a

28  co-inventor of that patent.  Throughout the ensuring months of investigation, there was conflicting

evidence as to whether Mr. Wilkins was a co-inventor of that patent.  Later in 2003, GE removed Mr. Wilkins as a named inventor of the 985 patent in its application.  Mr. Wilkins submits that based on its naming Mr. Wilkins that he was a co-inventor of the 985 patent application, GE was aware in 2003 that he had a potential stake in the patent at this time.  The 985 patent issued in 2005.

On March 16, 2004, Mr. Mendonsa recorded the at the United States Patent and Trademark Office ("USPTO") an assignment of the application for the 565 patent executed by all of the named inventors except Mr. Wilkins.  On the next day, Mr. Mendonsa submitted a petition to the USPTO requesting to continue the application for the 565 patent in the name of the "refusing co-inventor, Thomas A. Wilkins," accompanied by (1) a declaration of Mr. Mendonsa setting forth facts to support the petition and (2) a petition fee of $130.  The 565 patent issued on August 2, 2005 without any assignment from Mr. Wilkins being recorded.

### ITC Action

In 2008, GE asserted claim 15 of the 985 patent against intervenors Mitsubishi before the International Trade Commission ("ITC").  The parties engaged in discovery in that action.  Mr. Wilkins, though not a party, testified at a deposition and through at the hearing.  GE claims that it first learned of Mr. Wilkins' position that he had an interest in the 985 patent in his 2008 deposition testimony he gave in the ITC action.

After discovery and a seven-day hearing, the administrative law judge found that the "evidence is clear and convincing that Thomas Wilkins was an inventor of at least the invention of claim 15 of the '985 patent."  On review, the full ITC agreed with the administrative law judge that "Wilkins is an unnamed inventor of claim 15 of the '985 patent." This conclusion was based on the work that Mr. Wilkins performed while at Lake Benton II as well as the discussions Mr. Wilkins had in Germany in May 2002.  The Commission further found that GE failed to "provid[e] any showing to the effect that Wilkins had an obligation to assign the patent to GE."[2]

### Mr. Wilkins Licenses to Mitsubishi

In 2009, Mr. Wilkins licensed part of the 985 patent technology to Mitsubishi.

---

[2]GE appealed one issue–unrelated to the issues raised in this action– to the Federal Circuit Court of Appeals.  The Federal Circuit remanded that appeal to the ITC. *See Gen. Elec. Co. v. Int'l Trade Comm'n*, 670 F.3d 1206 (Fed. Cir. 2012).

**Relevant Procedural History**

On April 25, 2010, three months after the ITC's full Commission ruling that Mr. Wilkins was a co-inventor of the 985 patent, GE initiated this action against Mr. Wilkins. GE asserted that Mr. Wilkins either agreed to assign his rights to his inventions through the EIPIA or that he had a duty to assign his rights to his inventions pursuant to California Labor Code Section 2860.

The parties have engaged in extensive law and motion and discovery practice. Some of the parties' arguments raised in this motion have been raised before. For example, Mr. Wilkins previously raised its argument that GE's claims were time-barred in a motion to dismiss. Those arguments were rejected in large part based on the standards of review applicable to a Fed. R. Civ. P. 12(b)(6) motion. GE further sought and obtained a preliminary injunction enjoining Mr. Wilkins from licensing any interest in the technologies described in the 565 or 985 patents. GE relies heavily on these prior orders in these motions.[3]

In its first amended complaint ("FAC"), GE asserted eight claims against Mr. Wilkins for breach of contract and declaratory relief. The majority of these claims were based on breach of contract theories related to an alleged EIPIA or other assignment agreements between Mr. Wilkins and either GE or Enron Wind. GE dismissed these claims with prejudice shortly before the parties filed their summary adjudication motions. Accordingly, GE's remaining claims include:

1.　　Third Cause of Action.　Declaratory Relief–Rights to '985 Patent.

2.　　Sixth Cause of Action.　Declaratory Relief–Rights to '565 Patent.

3.　　Eighth Cause of Action.　Declaratory Relief–Rights to Inventions During Employment.

In his third and sixth causes of action, GE asserts that "[e]ven in the absence of contractual agreement, pursuant to California law, including, but not limited to, California Labor Code 2860,

---

[3] This action was assigned to the undersigned after the order on Mr. Wilkins' motion to dismiss and the order granting GE's preliminary injunction due to the retirement of a district judge in this district. Accordingly, this Court did not issue those orders. In addition, GE's repeated reliance on those orders throughout its briefing on these motions is unavailing, considering the applicable standards of review, including that the court was required to assume the truth of the allegations in the FAC previously, the developed factual record now before the Court, and the Court's consideration of the applicable case law, as discussed more fully *infra*. In addition, GE appears to argue that this Court cannot or should not reconsider these previous rulings. To the contrary, this Court is not bound by its interlocutory orders, which are not final, and may reconsider or modify them at any time. *See Marconi Wireless Telegraph Co. v. United States*, 320 U.S. 1 (1943); *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001).

Wilkins is required to assign to GE any interest he claimed to have in the [565 patent and 985 patent] and to the invention covered by the [patents]. Wilkins is further constrained under California law from purporting to offer to license the [patents] and/or the invention covered by the [patents] to third parties." FAC,¶¶ 57, 84.  Pursuant to these claims, GE submits that it is entitled to a declaration: "(I) that as between GE and Wilkins, GE is the sole legal and equitable owner of the [patents] and the invention covered by the [patents]; (ii) that Wilkins has no ownership interest in the [patents] and the invention covered by the [patents]; (iii) that Wilkins has no right to license the [patents]; and (iv) an order that Wilkins execute any necessary documents to confirm formally GE's ownership and to remove the cloud on GE's ownership by his failure to do so." FAC, ¶¶60, 87.

In the remaining part of his eighth cause of action, GE seeks declaratory judgment that "[e]ven in the absence of contractual agreement, pursuant to California law Wilkins was required to assign to GE any interest he claimed to have in any invention made by Wilkins during the course of his employment at Enron and GE." FAC, ¶97.

The parties have filed summary judgment and summary adjudication motions.  The motions have been fully briefed. Mitsubishi filed a statement of non-opposition to Mr. Wilkins' summary judgment motion and opposed GE's summary judgment motion.  Mitsubishi also filed a separate partial summary judgment motion in its favor on its first counterclaim against GE; i.e., that Mr. Wilkins is a co-inventor of the subject matter claimed in the 985 patent.  This order addresses the issues raised in GE's and Mr. Wilkins' summary adjudication motions.   This Court shall address Mitsubishi's partial summary judgment motion by separate order.

This Court carefully reviewed and considered the record, including the parties' arguments, the admissible evidence attached thereto, judicially noticeable facts submitted, and the applicable case law. Omission of reference to an argument, document, or objection shall not be construed to the effect that this Court did not consider the argument, document, or objection or paper.  Pursuant to that thorough review, this Court issues the following order.

## STANDARD OF REVIEW

GE and Mr. Wilkins both seek partial summary judgment as to GE's remaining claims pursuant to Fed. R. Civ. P. 56. Fed. R. Civ. P.  56(a) permits a party to seek summary judgment "identifying each

10

claim or defense—or the part of each claim or defense—on which summary judgment is sought." "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir.1999). Summary judgment or adjudication is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn*., 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.*, 475 U.S. at 586, n. 11; *International Union of Bricklayers v. Martin Jaska, Inc*., 752 F.2d 1401, 1405 (9th Cir.1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. Fed. R. Civ. P. 56(a), (c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.1997); *see also*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences from the facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000); *see also*, *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (2007) (moving party is able to prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case"). A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily

11

renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102–03. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id*. at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id*.  "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id*.; *Celotex*, 477 U.S. at 322. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Aydin Corp. v. Loral Corp*., 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288–289 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

### DISCUSSION

### GE's Remaining Claims

GE's remaining claims seek declaratory relief that "pursuant to...California Labor Code §2860, Wilkins is required to assign to GE any interest he claimed...[and] is...constrained under California law from purporting to offer to license [the subject technology]." FAC at ¶¶14, 19.  GE's third cause of action seeks declaratory relief that Mr. Wilkins was required to assign his claimed interest in the 985 patent and was constrained from licensing it.  GE's sixth cause of action seeks similar relief related to the 565 patent.  GE's eight cause of action seeks a declaratory that Mr. Wilkins was required to assign his rights to his inventions to his employer pursuant to California law.

///

**Whether California Labor Code Section 2860 Required Mr. Wilkins to Assign his Patent Rights**

**Introduction**

Although this Court would normally address a statute of limitations defense first, an understanding and parsing out of GE's claims based on California Labor Code Section 2860 ("Section 2860") is required before this Court can determine whether, and when, if at all, the statute of limitations began to accrue. "For a declaratory judgment action, the limitations period begins when the corresponding claim for damages or injunction accrues." *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular*, 583 F.3d 832, 846 (Fed. Cir. 2009) ("*Stanford I*") (citing *Howard Jarvis Taxpayers Assn. v. City of La Habra*, 25 Cal. 4th 809, 821 (2001)). Here, the parties have very divergent views of the meaning and scope of the rights and obligations under California law. The Court must first determine the scope and meaning of the claims asserted by GE before it can determine when the claims began to accrue.

GE's remaining claims rest on GE's position that California Labor Code Section 2860 required Mr. Wilkins to assign his invention rights to his employer. California Labor Code Section 2860 reads:

> Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.

*Id*. GE submits that this statute embodies the principle that "where an employee creates something as part of his duties under this employment, the thing created is the property of his employer[.]" *Zahler v. Columbia Pictures Corp*., 180 Cal. App. 2d 582, 589 (1960). GE argues that based on his law and principle, and because Mr. Wilkins was hired by Enron Wind and GE to develop new technologies, Mr. Wilkins did the work at his employer's direction, on company time, and with the assistance of company co-workers and business partners, using company facilities at company expense, then all of his work on the ride-through and DVAR belongs to his employers. To support its position, GE relies on this court's previous preliminary injunction order, noting that the court granted a preliminary injunction in its favor based, in part, on the court's conclusion that it was likely to succeed on the merits of its equitable claims based in part on these arguments.

Mr. Wilkins challenges GE's legal analysis of California Labor Code Section 2860 on a number

13

of grounds.  First, Mr. Wilkins argues that Section 2860 does not apply to inventions.  For this position, Mr. Wilkins points out that when California enacted subsequent statutes dealing directly with inventions made by employees in 1979, the California legislature noted that the "existing law" in California "contained no provisions relating to the ownership of an invention made by an employee."  Additionally, because these more specific statutes relate to inventions, such a broad reading of Section 2860 would render some of the later statute superfluous.  Second, Mr. Wilkins asserts that California makes clear that Section 2860 applies only to things an employee "acquires" by virtue of the employment, not to things "created" by an employee.  Mr. Wilkins argues that an inventions are created, not acquired.  Third, Mr. Wilkins points out that the cases relied on by GE either do not discuss Section 2860, do not embody the California precedent suggested by GE, or have no precedential value.  Fourth, Mr. Wilkins points out that California precedent has not applied Section 2860 to transfer patent rights in the absence of an express agreement to assign.  Finally, Mr. Wilkins argues that federal and California law confirm that the assignment of rights of an invention between an employer and employee is controlled by an express agreement.

Mitsubishi agrees with Mr. Wilkins' position that absent an express contract, Mr. Wilkins retained his rights to his patents.  Mitsubishi argues that since Mr. Wilkins signed no assignment agreement, and expressly refused to sign multiple assignment agreements, Mr. Wilkins had no duty to assign his patent rights to his employer.  Mitsubishi further argues that Section 2860 is inapplicable because it does not apply to inventions.  If Section 2860 does apply, then Mitsubishi contends that it only raises a presumption that is overcome by the absence of an express written assignment agreement.

This Court's analysis of Section 2860 and how it relates to invention rights must begin with an understanding of patent law.  Section 2860 must be considered within the context of broader patent rights, because while questions of contract law are matters of state law, questions related to patent law are interpreted according to federal law. *Univ. of W. Va. v. Van Voorhies*, 278 F.3d 1288, 1296-97 (Fed. Cir. 2002).  Next, the Court shall consider the history of Section 2860, its application to patent rights, and Section 2860 in light of later California statutory and case law.  Finally, the Court shall address the parties' arguments to determine the scope of Section 2860 and how it relates to GE's claims.

**Patent Law and Inventor's Rights**

14

1    Article I, section 8, clause 8 of the United States Constitution confers onto Congress the authority

2  to "promote the Progress of Science and useful Arts, by securing...to the Authors and Inventors the

3  exclusive Right to Their respective Writings and Discoveries."   The first Patent Act was passed by

4  Congress in 1790.  The United States Supreme Court recently noted that "[a]lthough much in intellectual

5  property law has changed in the 220 years since the first Patent Act, the basic idea that inventors have

6  the right to patent their inventions has not." *Bd. of Trustees of the Leland Stanford Jr. Univ. v. Roche*

7  *Molecular Sys., Inc.*, 131 S.Ct. 2188, 2194 (2011) ("*Stanford II*").   Pursuant to the law in its current

8  form, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or

9  composition of matter...may obtain a patent therefor." 33 U.S.C. §101.

10    For over 150 years, Supreme Court precedent has consistently confirmed "the general rule that

11  rights in an invention belong to the inventor." *Stanford II*, 131 S.Ct. at 2195 (citing *Gayler v. Wilder*,

12  51 U.S. 477 (1851) ("the discoverer of a new and useful improvement is vested by law with an inchoate

13  right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which

14  the law requires"); *Solomons v. United States*, 137 U.S. 342, 346 (1890) ("whatever invention [an

15  inventor] may thus conceive and perfect is his individual property"); *United States v. Dubalier*

16  *Condenser Corp.*, 289 U.S. 178, 188 (an inventor owns "the product of [his] original thought")).

17    A principle that is "equally well established" is that "an inventor can assign his rights in an

18  invention to a third party." *Stanford II*, 131 S.Ct. at 2195. "A patent is property, and title to it can pass

19  only by assignment." *Dubilier*, 289 U.S. 178.   "Thus, although others may acquire an interest in an

20  invention, any such interest–as a general rule–must trace back to the inventor." *Stanford II*, 131 S.Ct.

21  at 2195.

22    "In accordance with these principles," the Supreme Court has "recognized that unless there is

23  an agreement to the contrary, an employer does not have rights in an invention 'which is the original

24  conception of the employee alone.'" *Id*. (quoting *Dubilier*, 289 U.S. at 189).  "In most circumstances,

25  an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain

26  those rights." *Id*.  This is because the "respective rights and obligations of employer and employee,

27  touching an invention conceived by the latter, spring from the contract of employment." *Dubilier*, 289

28  U.S. at 187 (quoted in *Stanford II*, 131 S.Ct. at 2195).  Because an assignment of patent rights from an

15

employee to an employer must be by express agreement, the Supreme Court has "rejected the idea that mere employment is sufficient to vest title to an employee's invention in the inventor." *Stanford II*, 131 S.Ct. at 2196.

Congress has passed statutes that have "divested inventors of their rights in inventions." *Id*. Like the express assignment contracts between an employer and employee, however, and consistent with the general patent law principles, those laws must be "unambiguous" that certain specified inventions shall become the property of the United States. For example, one federal statute provides that certain contracts dealing with nuclear material and atomic energy "shall be vested in, and by the property of, the [Atomic Energy] Commission." 42 U.S.C.§ 2182. As another example, Congress has pass legislation that requires title to certain inventions under contracts with the Department of Energy "shall vest in the United States." 42 U.S.C. §5908.

According to this history, the basic principles as related to the rights of patents as between an employer and employee have remained consistent for over 150. In summary: "A patent is property, and title to it can pass only by assignment." *Dubilier*, 289 U.S. at 188. "The respective rights and obligations of employer and employee, touching an invention conceived by the latter, spring from the contract of employment." *Id*. "One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained." *Id*. at 189. That is, if an employee is hired to invent, then "he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster." *Id*. "On the other hand, if the employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. " *Id*.

### Early California law and Section 2860

Early California law was consistent with the federal law related to patents in the absence of Section 2860. For example, in 1920, a California appellate court explained that employees are entitled to their own independent inventions and, in the absence of an express contract or agreement, the employment relationship alone does not invest the employer with the patent rights of the employee.

16

*Famous Players-Lasky Corp. v. Ewing*, 49 Cal. App. 676 (1920).  As between an employer and an employer who was hired for a special purpose to invent, however, a presumption exists in favor of the an assignment of those patent rights to the employer. *Id*.  These concepts were affirmed in *Goodyear Tire & Rubber Co. of Akron, Ohio v. Miller*, 22 F.3d 353 (1927), which ruled that an invention made by an employee hired to make it belongs to the employer, whether or not the parties had a contract to that effect.

Section 2860 was enacted in 1937.  Since that time, only a few California cases have applied this statute to the rights of inventions as between employers and employees.[4]  And those cases have all affirmed the basic principles of patent law set forth above.  For example, in *Aero Bolt & Screw Co. v. Iaia*, 180 Cal. App. 2d 728 (1960), the California appellate court ruled that the mere existence of an employer-employee relationship by itself was insufficient to entitle the employer to partake of the benefits of an employee's inventive genius.  If the employee used the employer's materials and conceived of and perfected the invention for which he obtained a patent during business hours, however, then the employee must assign to the employer a nonexclusive license to the invention. *Id*.; *accord*, *Dubilier*, 289 U.S. at 190.  Under those circumstances, and in considering Section 2860, the court did not require the employee to assign all rights to the invention to the employer. *Id*.  California courts further affirmed the idea that an employer who was hired for the specific purpose to invent was required to assign his or her rights in the patent to the employer.  *See, e.g., Williams v. Weisser*, 273 Cal. App. 2d 726 (1969).  As both Mitsubishi and Mr. Wilkins point out, Section 2860 has never been applied to revoke an employee's right to his invention in the absence of a written agreement, whether that be an employment agreement that the employee was hired to invent or a written assignment agreement.

### California Labor Code Section 2870 and Later California Law

In 1979, California passed new legislation specific to inventions in the workplace, including California Labor Code Sections 2870-72.  California Labor Code Section 2870, entitled "Application of provision that employee shall assign or offer to assign rights in invention to employer" provides:

(a) Any provision in an employment agreement which provides that an employee shall

---

[4]Mr. Wilkins correctly notes that Section 2860 mainly has been construed to govern trade secrets and information acquired by an employee by virtue of his or her employment and related unfair competition matters.

17

assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

When enacting these provisions, the California Legislature indicated that "[t]he existing law...contains no provisions relating to the right to ownership of an invention made by an employee." A.B. 474, 1979-80 Reg. Sess. (Goggin) (introduced Feb. 5, 1979, last amended Sept. 4, 1979). As set forth above, Section 2860 was enacted over 45 years prior to that time. Since the enactment of these statutes specific to rights to inventions between employers and employees, this Court has not found any California cases that have interpreted Section 2860 to include a duty to assign invention rights from an employee to an employer.

## Discussion of Parties' Arguments and Court's Conclusions

With this background, this Court now turns to a discussion of the parties' arguments.

GE maintains that under California law, it is well established that an employer owns inventions made within the scope of an employee's employment. GE's interpretation of the California cases is overly broad. As set forth above, California case law affirms the narrower principle that an employee who was *hired to invent* a specific technology has a duty to assign his or her rights to his employer. *See Goodyear Tire & Rubber Co.*, 22 F.3d 353. This principle, consistent with federal patent law, is based on the idea that this arrangement and assignment was contemplated in the employment contract and that the employee's sole responsibility was to create the invention. *See, Dubilier, supra.* ("His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster."). Section 2860's ambiguous terms, which do not address the rights of inventors specifically, do not broaden this well-settled legal principle. Moreover, considering the more specific California statutory language, and the lack of California cases interpreting

Section 2860 to apply to inventions thereafter, this Court doubts whether the California cases applying Section 2860 to invention rights continues to be viable.

None of the cases relied on by GE either support its position or convinces this Court that the an employee must assign all invention rights to his or her employer that were created simply in the course of employment. Indeed, California law and federal patent law have affirmatively ruled to the contrary. As set forth above, absent an express agreement to the contrary (whether that be an agreement to assign or a term of the employment contract), the Supreme Court has "rejected the idea that mere employment is sufficient to vest title to an employee's invention in the inventor." *Stanford II*, 131 S.Ct. at 2196. California case law interpreting Section 2860 is in accord. *See, Aero Bolt & Screw Co.*, 180 Cal. App. 2d 728.

Based on these well-settled principles of law, this Court finds that if Mr. Wilkins was "hired to invent" the technologies that formed the basis of the 565 and 985 patents, then Mr. Wilkins had a duty to assign his rights in those patents to his employer. *See Dubilier*, *supra*, and *Dalzell v. Dueber Watch Case Mfg. Co.*, 149 U.S. 315 (1893) (explaining differences between one hired to invent and one who invents during the scope of employment). This Court further finds that although Section 2860 has been construed to be inapplicable to an employee's inventive conceptions absent an express agreement, this statute does embody the principle that covers an employee's inventive rights if that employee was hired to invent. *See, e.g., KGB, Inc. v. Giannoulas*, 164 Cal. Rptr. 571, 582 (1980) ("The language in [Section 2860] has been applied to protect employee misappropriation of trade secrets and confidential information gained during employment; it has not been used to protect an actor's or artist's creations during employment in the absence of a contract providing express protection."). Since an employment contract hiring Mr. Wilkins to invent would be the express type of agreement that would require assignment of his rights, Section 2860 is applicable to the extent that Mr. Wilkins was hired to invent.

Several material questions of fact preclude summary adjudication on GE's duty to assign claims. First, both parties raise material questions of fact as to whether Mr. Wilkins was "hired to invent" the technologies or whether he developed the ideas through the course of his employment. Second, the parties raise material issues of fact as to which employer, if any, to whom Mr. Wilkins was required to assign those rights. Based *inter alia* on these disputed material facts, this Court denies both GE's and

1   Mr. Wilkins' summary adjudication motions on this issue.

2          If the fact-finder concludes that Mr. Wilkins was not hired to invent, however, then Section 2860

3   would be inapplicable and Mr. Wilkins had no duty to assign his rights to his inventions to his employer.

4   As set forth above, mere employment is insufficient to vest title to Mr. Wilkins' right in the patents to

5   his employer. GE erroneously argues that pursuant to California law, Mr. Wilkins was required to assign

6   his rights to the patents because he created the technology during the scope of his employment, during

7   company time, with company materials, and in consultation with other company employees.   In this

8   event, Mr. Wilkins has no duty to assign all rights to the inventions to his employer.   Rather, based on

9   equitable principles, Mr. Wilkins has a duty to grant his employer a non-exclusive license to use the

10  invention.  See *Aero Bolt & Screw Co.*, 180 Cal. App. 2d 728 (explaining "shop right" of employers).

11  As explained in *Dubilier*:

12          [W]here a servant, during his hours of employment, working with his master's materials
            and appliances, conceives and perfects an invention for which he obtains a patent, he
            must accord his master a nonexclusive right to practice the invention...But the employer
13          in such a case has no equity to demand a conveyance of the invention, which is the
            original conception of the employee alone, in which the employer had no part. This
14          remains the property of him who conceived it, together with the right conferred by the
            patent, to exclude all others than the employer from the accruing benefits. These
15          principles are settled as respects private employment.

16

17  289 U.S. at 190.  For these reasons, and absent an express contract or employment term to the contrary,

18  Mr. Wilkins had no duty to assign his rights to the patents to his employer if he were not hired to invent.

19          **Whether GE's Claims are Barred by the Statute of Limitations**

20          Next, the Court considers Mr. Wilkins' affirmative defense that GE's claims are barred by the

21  statute of limitations.  Mr. Wilkins asserts that GE's causes of action accrued in 2005, at the latest.

22  Because GE did not file this action until 2010, Mr. Wilkins concludes, these claims are time-barred.

23          Mr. Wilkins argues that the undisputed facts show that by 2005, when the patents were issued

24  by the USPTO, GE could have filed the very same declaratory relief action that it belatedly asserted in

25  2010. By 2005, Mr. Wilkins had (1) refused to sign GE's invention rights agreement (in 2002) and (2)

26  refused GE's request to assign the rights of one of his inventions (in 2004).  When the patents issued in

27  2005, GE could have alleged that Mr. Wilkins is required to assign "any rights or claimed rights he has"

28  in the patents, seeking the same broad declaratory relief it seeks in this case.  Mr. Wilkins contends that

1    GE's assertion of these claims in 2010 was untimely.

2         "The limitations period for declaratory relief claims depends on the right or obligation sought

3    to be enforced and the statute of limitations' application generally follows its application to actions for

4    damages or injunction on the same rights and obligations." *Ginsberg v. Gamson*, 205 Cal. App. 4th 873,

5    883 (2012).  The applicable statute of limitations on an action brought pursuant to California Labor Code

6    section 2860 is two years pursuant to California Civil Procedure Code 339(1).

7         Pursuant to California law, a "statute of limitations does not begin to run until the cause of action

8    accrues.  Equally basic is that a cause of action does not accrue until the party owning it is entitled to

9    begin to prosecute an action thereon, that is, not until the last element essential to the cause of action

10   occurs." *Stanford I*, 583 F.3d at 846 (quoting *Spear v. Cal. State Auto. Ass'n*, 2 Cal. 4th 1035, 1040

11   (1992)).  "For a declaratory judgment action, the limitations period being when the corresponding claim

12   for damages or injunction accrues." *Stanford I*, 583 F.3d at 846 (citing *Howard Jarvis Taxpayers Assn.*

13   *v. City of La Habra*, 25 Cal. 4th 809, 821 (2001)).  The discovery rule "postpones accrual of a cause of

14   action until the plaintiff discovers, or has reason to discover, the cause of action." *E-Fab, Inc. v.*

15   *Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1318 (2007).  This means that the "statute of

16   limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause."

17   *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005).  "While resolution of the statute of

18   limitations issue is normally a question of fact, where the uncontradicted facts established through

19   discovery are susceptible of only one legitimate inference, summary judgment is proper." *Jolly v. Eli*

20   *Lilly & Co.*, 44 Cal. 3d 1103, 1112 (1988).

21        As set forth above, the specific right or obligation asserted is significant to this Court's analysis

22   of the statute of limitations defense.  GE argues that Mr. Wilkins had a duty to assign his rights to the

23   patents by virtue of his employment.  GE reads Section 2860 to embody a principle that relates to an

24   employment relationship; specifically, that Mr. Wilkins had a duty to assign his rights pursuant to the

25   employment relationship.  These principles are rooted in contract law, since, as discussed more fully

26   above, assignment of one's rights to a patent is governed by contract law.  Accordingly, this Court shall

27   apply contract principles, rather than tort principles, to determine when GE's claims accrued.

28        "The statutory limitations period for a breach of contract commences when the party wronged

21

knows, or reasonably should know of the breach." *Jaffe v. Carroll*, 35 Cal. App. 3d 53, 58-59 (1973). A "cause of action for breach of contract ordinarily accrues at the time of the breach regardless of whether any substantial damage is apparent or ascertainable." *Menefee v. Ostawari*, 228 Cal. App. 3d 239, 246 (1991). GE argues that the statute of limitations did not begin to run until it had sustained ascertainable damages. "While incurring a loss has always been a prerequisite to accrual of a cuase of action in tort, it has never been a requirement in contract law." *Tabachnick v. Ticor Title Ins. Co.*, 24 Cal. App. 4th 70, 76 (1994). Accordingly, this Court finds that the statute of limitations began to accrue at the time that Mr. Wilkins allegedly breached his duty to assign to his employer his rights to the patents.

In so ruling, this Court rejects Mr. Wilkins' arguments made to the extent that the statute of limitations began to run at the time that he could have maintained a declaratory judgment action. A "party may seek declaratory relief before there has been an actual breach of an obligation; in such cases the limitations period still does not begin to run until the breach occurs." *Ginsberg*, 205 Cal. App. 4th at 883. "The cause of action for declaratory relief may accrue, in the sense that an action may be maintained, before any breach occurs. That is the very purpose of the remedy." *United Pacific-Reliance Ins. Co. v. DiDomenico*, 173 Cal. App. 3d 673, 676 (1985) (quoting 3 Witkin, Cal. Proc. (3d ed. 1985 Actions, § 475, p. 507). Thus, even if a declaratory judgment action could have been maintained, the statute of limitations did not begin to run until Mr. Wilkins allegedly breached his duty to assign, if any.

Mr. Wilkins argues that the breach of his obligation to assign his rights to the patents occurred in either 2002 when he refused to sign the EIPI Agreement or in 2004 when Mr. Wilkins refused GE's patent attorney's request that he assign his rights in the inventions to GE. GE argues that even though Mr. Wilkins' employment ended with GE in 2002, he waited until 2008 to first claim that he was an unnamed inventor of the 985 patent. GE contends that it was on notice that Mr. Wilkins claimed rights in the 985 patent only when Mitsubishi deposed Mr. Wilkins in an ITC action. Months later, Mr. Wilkins acted on his new inventorship and ownership assertions by purporting to license under the 985 patent to Mitsubishi. GE argues that the statute of limitations that its claims did not begin to run until it suffered compensable harm to its patents in 2009. Finally, GE argues that even if it had suffered compensable harm and had received notice in 2004, Mr. Wilkins' 2009 and 2010 licensing activities

renders this suit timely.  The Court considers each of these events and arguments to determine whether, and if so when, the statute of limitations for GE's claims began to accrue.

## 2002 Refusal to Sign EIPIA

As set forth more fully above, Mr. Wilkins asserts that he refused to sign the EIPIA when GE presented it to him at his exit interview in November 2002.  To support his position that he refused to sign the document, Mr. Wilkins produces his employment file with GE which indicates clearly that he refused to sign the EIPIA as well as two contemporaneous emails from GE employees that confirms that he did not sign the document.  Mr. Wilkins contends that this refusal to sign the EIPIA at that time put GE on notice that he was indisputably refusing to assign his rights in his inventions to GE.  Mr. Wilkins argues that GE's claims for a beach of this alleged duty to assign began to accrue when he indisputably refused to assign those rights in November 2002.  *See Goldwasser v. Smith Corona Corp*., 817 F.Supp. 263, 271-72 (D. Conn. 1993), *aff'd*, 26 F.3d 137 (Fed. Cir. 1994) ("A breach of the Employee Agreement occurred only after IBM demanded assignment and Goldwasser refused to do so.  Only at that point would the breach of the Employee Agreement trigger the running of the statute of limitations.").

GE disputes whether Mr. Wilkins refused to sign the document.  Although they do not have the signed document, they submit testimony that he was required to sign the EIPIA as a condition of employment and that no exceptions were made for Mr. Wilkins.

If Mr. Wilkins refused to sign the EIPIA in November 2002, and GE was on notice that Mr. Wilkins refused to sign the EIPIA, then Mr. Wilkins breached his alleged duty to assign all of his invention rights to GE for all of the inventions that he created during the term of his employment.  GE's presentation of the EIPIA could be construed to be its demand to Mr. Wilkins to assign all of his rights to the patents to GE.  The EIPIA covered all inventions during the scope of his period, including both the 565 and the 985 patents.  Mr. Wilkins' refusal to sign could have constituted a breach of a duty to assign, which would have triggered the statute of limitations for both the 565 and 985 patents, if GE was on notice that he refused to assign when GE when the assignment demand.

Because there is a question of fact as to whether Mr. Wilkins' refused to sign the EIPIA and whether GE was on notice in November or December 2002 of whether Mr. Wilkins refused the request

23

1   to assign all of his invention rights to GE, this Court must deny Mr. Wilkins' summary adjudication

2   motion on this issue.  If a trier of fact determines that Mr. Wilkins' refused to sign the EIPIA and that

3   GE knew that he refused to sign the EIPIA in November or December 2002, then the limitations period

4   would have began to run on all of GE's claims at that time.  If a trier of fact makes those factual

5   determinations, then GE's claims are time-barred as a matter of law.

6   **2004 Refusal to Sign Assignment Agreement Related to 565 Patent and**
**2005 Issuance of 565 Patent**

7

8          Next, Mr. Wilkins asserts that the events of 2004 and 2005 triggered the statute of limitations,

9   rendering this action untimely.  As discussed more fully above, GE's patent attorney sent Mr. Wilkins

10  an assignment agreement in relation to its application with the USPTO for the 565 patent.  Mr. Wilkins

11  told GE's patent attorney by telephone that he refused to sign the assignment agreement.  Then Mr.

12  Wilkins sent the unsigned copy of the agreement back to the attorney.  Mr. Wilkins' refusal to sign the

13  assignment agreement caused GE to request permission to continue prosecuting the patent application

14  absent the assignment of Mr. Wilkins, a named co-inventor in the patent.  GE had to pay a fee for that

15  application.  Ultimately, when the patent issued, it issued without Mr. Wilkins' agreement to assign.

16         Based on these undisputed facts, this Court finds that the statute of limitations began to run on

17  GE's duty to assign claims related to the 565 patent no later than 2005.  "While resolution of the statute

18  of limitations issue is normally a question of fact, where the uncontradicted facts established through

19  discovery are susceptible of only one legitimate inference, summary judgment is proper." *Jolly*, 44 Cal.

20  3d at 1112.  The facts are undisputed that Mr. Wilkins refused GE's demand that he assign his rights to

21  the 565 patent in 2004.  The facts are further undisputed that GE knew that Mr. Wilkins refused to

22  assign, not only because of the notice to GE's patent attorney, but also because GE was required to seek

23  permission with the USPTO to continue the prosecution of the 565 patent absent the assignment.  The

24  565 patent was issued without Mr. Wilkins' assignment registered.  These undisputed facts establish

25  without a doubt that if Mr. Wilkins had a duty to assign his rights to the 565 patent to GE, he breached

26  that duty to assign no later than 2005.  The facts further demonstrate that GE had notice of this breach.

27  *See, Goldwasser*, 817 F. Supp. at 272; *compare*, *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F. Supp. 2d

28  471, 483 n.5 (S.D. N.Y. 2000) ("[T]here is no allegation that [employer] has exercised its rights to

24

require [employee] to execute the necessary documents to obtain the patents.  The statute of limitations on [employer's] rights would only begin to run at that point if [employee] refused to assign the patents.").[5]

### 2009 Licensing

GE asserts that it was put on notice as to the 985 patent in 2009 only when Mr. Wilkins asserted his ownership rights in that patent when he testified in relation to the ITC action and when Mr. Wilkins later purported to license part of the 985 patent technology to Mitsubishi.  If there was no breach of the asserted duty to assign in 2002, then the statute of limitations as to GE's claims related to the 985 patent began in 2009.  Accordingly, if a trier of fact determines that there was no breach in 2002, then GE's claims related to the 985 patent are timely.

GE claims, however, that even if there was a breach in 2002, Mr. Wilkins' attempt to license the 985 patent renewed the statute of limitations.  For this position, GE relies on the previous order on defendant's motion to dismiss.  In that order, the court ruled that when an employer's claim is predicated on an ex-employee's attempt to grant licences in the employer's intellectual property to a third party, "each licencing agreement presents a 'separate and distinct invasion of the [employer's] rights," and that the statute of limitations for each injury begins to run from the time a license in granted." Doc. 173 at p. 11 (quoting *Lugosi v. Universal Pictures*, 25 Cal. 3d. 813, 854 (1979) (Bird, C.J., dissenting)).[6]  As discussed above, this Court is not bound by the previous interlocutory order.

This Court agrees that Mr. Wilkins' license of the 985 patent presented a separate and distinct invasion of GE's rights.  That invasion, however, does not relate to the asserted duty to assign the patent rights to GE.  Rather, the license would invade other rights of GE, as discussed more fully below.  Thus, although this separate action would trigger a statute of limitations, it does not re-start the statute of limitations for GE's duty to assign claims.

---

[5] Even if this Court adopted GE's position that the statute of limitations did not begin to run until it incurred damages, GE's duty to assign claim related to the 565 patent began to accrue no later than 2005.  GE suffered an economic injury when it paid the fee to continue prosecution of the 565 patent without the assignment of Mr. Wilkins.  GE also suffered damages when the 565 patent issued without the assignment of Mr. Wilkins, which lowered the economic value of the patent.

[6] GE and the court's order claim that the language relied on by the court come from a concurrence in the opinion.  The language is found within a lengthy dissent.  Either way, the language would have no precedential value upon which this Court shall rely.

25

GE's declaratory judgment claims seek declaratory relief not only as to the duty to assign, but also that Mr. Wilkins "is further constrained under California law from purporting to offer to license the [patents] and/or the invention covered by the [patents] to third parties." This separate and distinct issue has not been argued by the parties. This Court finds that the statute of limitations on this issue as it pertains to the 985 patent did begin when Mr. Wilkins licensed part of the 985 patent to Mitsubishi. Accordingly, and regardless of the trier-of-fact's determination as to whether Mr. Wilkins' breached his duty to assign in 2002, GE's claim as to the 985 patent is timely to the extent they seek declaratory judgment that Mr. Wilkins is "constrained under California law from purporting to offer to license the 985 patent and/or the invention covered by the 985 patent to third parties."

### Rights of GE Based on Mr. Wilkins' Employment with Enron Wind

Finally, Mr. Wilkins asserts in opposition to GE's motion that GE is not entitled to any inventions Mr. Wilkins' made during his time with Enron Wind. To support this position, Mr. Wilkins argues that he never agreed to assign his rights to Enron Wind, Enron Wind never acquired title to Mr. Wilkins' inventions by either express agreement or implied terms embodied in California law, and GE never acquired any right from Enron Wind to seek an assignment from Mr. Wilkins. Because GE did not have an opportunity to respond to this opposition, and because this Court notes that these arguments are based on questions of fact, this Court takes this under submission to be determined at trial.

### Whether GE has Unclean Hands

Mitsubishi further argues that GE must present its claims at trial to resolve factual issues related to Mitsubishi's affirmative defenses, including whether GE has unclean hands. Mitsubishi asserts that GE knew Mr. Wilkins was a co-inventor and deliberately excluded him from the 985 patent application. Mitsubishi asserts that since GE knew that Mr. Wilkins was a co-inventor of the 985 patent, and acted unfairly in seeking to deny Mr. Wilkins his patent rights in that technology, it should be denied relief as any claims related to the 985 patent. Because Mitsubishi raises this in opposition to GE's motion, because GE had no opportunity to respond to this motion, and because these arguments are based on questions of fact, this Court takes this issue under submission to be determined at trial.

### CONCLUSION AND ORDER

For the foregoing reasons, this Court:

26

1.   GRANTS and DENIES in part GE's summary judgment motion;

2.   GRANTS and DENIES in part Mr. Wilkins' summary adjudication motion;

3.   CONCLUDES that Mr. Wilkins had a duty to assign his rights to his inventions to his employer *if he was hired to invent*.  Whether Mr. Wilkins was "hired to invent" is a factual question.  The parties have raised material questions of fact on that issue to preclude summary adjudication;

4.   CONCLUDES that Mr. Wilkins had no duty to assign his rights to his inventions if the inventions were made during the scope of his work as an employee.  This is a factual question, to be determined by a trier-of-fact;

5.   GRANTS judgment in Mr. Wilkins' favor as to GE's sixth and eighth claims for relief to the extent that GE seeks declaratory relief that Mr. Wilkins had a duty to assign his rights in the 565 patent, since the statute of limitations began to run no later than 2005 that Mr. Wilkins had breached the alleged duty to assign his rights in the 565 patent;

6.   CONCLUDES that factual questions remain as to whether Mr. Wilkins breached his duty to assign rights in the 985 patent in 2002;

7.   DENIES Mr. Wilkins summary adjudication motion as to GE's third claim for declaratory relief to the extent that GE seeks declaratory judgment that Mr. Wilkins is constrained under California law from licensing any part of the 985 patent to third parties.  That cause of action began to accrue in 2009 or 2010;

8.   CONCLUDES that questions of fact remain as to whether GE is entitled to Mr. Wilkins' rights that arose while he worked at Enron Wind; and

9.   CONCLUDES that questions of fact remain as to whether GE has unclean hands.


IT IS SO ORDERED.

Dated:   __August 31, 2012__           _____/s/ Lawrence J. O'Neill_____
                                             UNITED STATES DISTRICT JUDGE